**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

**ANNE TAETZSCH FITZGERALD, et al**

                Plaintiffs

v.                                          **Case No. 5:17-CV-00016**

**JAMES B. ALCORN, et al**

                Defendants.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

Plaintiffs Anne Taetzsch Fitzgerald, individually and as Chairwoman of the 20th House of Delegates District Republican Committee; Karen U. Kwiatkowski, individually; Edward A. Yensho, individually and as Chairman of the Green County Republican Committee; the 20th House of Delegates District Republican Committee; and the 6th Congressional District Republican Committee, by counsel, state as follows in opposition to Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief.

**INTRODUCTION**

**I.    The Committee Plaintiffs and Their First Amendment Rights.**

The First Amendment guarantee of free association protects the right of political parties to determine their internal rules. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 573 (2000) ("we have continually stressed that when States regulate parties' internal processes they must act within limits imposed by the Constitution."). Among the most important internal processes of any political party are those for selecting its leaders, and among the most important leaders of any political party are its nominees for public office. *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 229 (1989) ("Freedom of association also encompasses a political party's

decisions about the identity of, and the process for electing, its leaders."). Accordingly, the Supreme Court "vigorously affirm[s] the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'selects a standard bearer who best represents the party's ideologies and preferences.'" *Cal. Democratic Party,* 530 U.S. at 576 (cite).

The internal rules of Republican Party of Virginia (the "RPV") are set out in its Plan of Organization (the "Plan"). In the Plan, the RPV delegates its authority to determine the method of nomination for its candidates to certain committees constituted pursuant to the Plan. The committees also are given the right and responsibility of conducting the nomination processes, unless a state-run primary is chosen by the committee as the method of nomination.

The 20th House of Delegates District Republican Committee (the "20th District Committee") and the 6th Congressional District Republican Committee (the "6th District Committee") are unincorporated associations constituted pursuant to Plan. Under the Plan, the 20th District Committee is given the right and responsibility for determining the method of nomination for the Republican candidate for the 20th District of the Virginia House of Delegates (the "20th District"). Likewise, the 6th District Committee is given the right and responsibility for determining the method of nomination for the Republican candidate for Virginia's 6th Congressional District (the "6th District").

Anne Taetzsch Fitzgerald is the chairwoman of the 20th District Committee and Edward A. Yensho is the chairman of the Green County Republican Committee, which is given the right and responsibility for determining the method of nomination for Republican candidates for political and constitutional offices in Green County.

## II.     The Candidate Plaintiffs and Their Equal Protection Rights.

Plaintiff Karen U. Kwiatkowski previously stood for the Republican nomination for the 6th District, and is a prospective candidate for that nomination in 2018.  Plaintiff Edward A. Yensho  is a prospective candidate for the Republican nomination for the 24th Virginia State Senatorial District (the "24th District") in 2019.

The equal protection clause of the Fourteenth Amendment guarantees Ms. Kwiatkowski and Mr. Yensho (the "Candidate Plaintiffs") the right not to be discriminated against, as compared to similarly situated political candidates. "Discriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing purposes." *Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004) (cites omitted). Moreover, elections present particularly important equal protection issues, in light of the courts' obligation to keep the political process open and responsive. *United States v. Carolene Products, Co.,* 304 U.S. 144, 152 n.4.

## III.     The Incumbent Protection Act and its Enforcement.

Section 24.2-509(B) of the Code of Virginia, sometimes known as the "Incumbent Protection Act," *Marshall v. Meadows*, 105 F.3d 904, 905 n.1 (4th Cir. 1997), interferes with the rights of political parties to determine the method by which they select their nominees and discriminates against political challengers and in favor of incumbents. Specifically, the Act empowers an incumbent member of the Virginia Senate or House of Delegates who stands for re-election to dictate the method of nomination for the district, irrespective of the method of nomination chosen by his or her political party. As to other political offices, the Act requires nominations to be conducted by primary if an incumbent who was previously nominated by

primary stands for re-election, unless such incumbent consents to another method, again irrespective of the method of nomination chosen by his or her political party.

As alleged in the complaint, incumbent politicians regularly invoke or benefit from the Incumbent Protection Act. The Act has just as regularly been enforced and, when necessary, defended in court, by the Defendants, the Virginia Department of Elections and the members of the State Board of Elections (collectively, the "Board"). Indeed, in the Complaint, the Plaintiffs have alleged that the Act is enforced by the Defendants beyond its terms, to give Congressional incumbents who stand for re-election the power to dictate the method of nomination, rather than merely a veto over a non-primary process if they were previously nominated by primary. [Complaint, dkt 1, p. 9, ¶¶ 30-31].

### IV.    This Litigation.

In their Complaint, Ms. Fitzgerald, Mr. Yensho, the 20th District Committee and the 6th District Committee (the "Committee Plaintiffs") allege that the Incumbent Protection Act and its enforcement by the Defendants violates their First Amendment right of free association by usurping their right and responsibility under the Plan to determine the method by which the RPV's candidates for Green County, the 20th District and 6th District are nominated.

The Candidate Plaintiffs allege that the Act and its enforcement violates their Fourteenth Amendment right to equal protection of the law by facially discriminating in favor of incumbents, despite the fact that incumbents and challengers such as the Committee Plaintiffs are similarly situated inasmuch as they are competitors in the same political process.

In their Motion to Dismiss and the accompanying Memorandum in Support of their Motion (the "Memorandum"), the Defendants assert that all the Plaintiffs lack constitutional standing because none has alleged an injury in fact. The Defendants' essential argument that the

Plaintiffs lack standing is based on the timing of this case. According to the Defendants, Plaintiffs filed this case too soon, before their injuries are threatened or actual.

Indeed, according to the Defendants' arguments in this case and in prior litigation challenging the Act, not only is this case untimely, but any case challenging the Incumbent Protection Act necessarily will be. On the Defendants' account is it never possible to meaningfully challenge the Act; any suit is either too premature to support standing, or too late to allow the courts to grant a timely remedy. In effect, the Defendants' argument strips this Court of any effective jurisdiction, and makes the Act unreviewable.

This is, of course, incorrect. Viewed correctly, and in light of relevant precedent, there is no question that the Plaintiffs have alleged facts sufficient to establish standing at the pleading stage in this case.

## THE LEGAL STANDARD

"There are three components of constitutional standing: (1) the plaintiff must allege that he or she suffered an actual or threatened injury that is not conjectural or hypothetical, (2) the injury must be fairly traceable to the challenged conduct; and (3) a favorable decision must be likely to redress the injury." *Miller v. Brown,* 462 F.3d 312, 316 (4th Cir. 2006) ("*Miler I*"), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

### I.     The Burden at the Pleading Stage.

In reflecting on the well-known components of constitutional standing one must note two things. First, latitude is built into each prong of the test. An injury in fact can be actual *or threatened*. Causation is present if the injury is *fairly* traceable to the challenged conduct. And redressability is exists if it is *likely* that a favorable court decision will redress the injury. Second, Plaintiffs' burden at this stage in the litigation is not onerous. "At the pleading stage, general

factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan,* 504 U.S. at 561. Thus, the question before the Court at this stage of the litigation is: have Plaintiffs have alleged facts sufficient to establish standing?

## II.    Injury in Fact in *Miller I.*

Defendants identify *Miller I* as an important precedent that provides great insight into the questions before this Court, and they are correct. The *Miller* plaintiffs, the 11th Senatorial District Republican Committee and its chairman, sued the then-members of the Board challenging Section 24.2-530 of the Code of Virginia, the so-called "Open Primary Law." Suit was brought on April 12, 2005, challenging the application of the Open Primary Law to the Republican nomination during the 2007 election cycle, which would conclude over two years later. *Miller I,* 562 F.3d at 316.

The *Miller* defendants filed a Motion to Dismiss for lack of standing, which was granted by the District Court. *Id.* at 316. The district court held that the asserted injuries were not actual or threatened, because it was not yet certain that the Open Primary Law would be enforced against the *Miller* plaintiffs. *Id.*

The District Court identified several reasons it was not then certain that the Open Primary Law would not be enforced against the *Miller* plaintiffs, despite the fact that the incumbent had exercised his right under the Incumbent Protection Act to demand a primary. First, the incumbent was not yet an official candidate for the office in question and could not officially declare his candidacy until at least March 27, 2007. *Id.*; *Va. Code* § 24.2-520. If the incumbent declined to stand for office, the *Miller* plaintiffs would have been free to choose a method of nomination other than a primary. See *Va. Code* § 24.2-509. Second, the incumbent could be

unopposed in the nomination process, in which case a primary would not be conducted. *Miller I*, 562 F.3d at 316; *Va. Code* § 24.2-526.

When the *Miller* plaintiffs filed suit it was far from certain that the Open Primary Law would be enforced against the *Miller* plaintiffs. Moreover, whether the Open Primary Law would be enforced against the *Miller* plaintiffs was dependent on the decisions of third parties (the incumbent and potential challengers), and not merely those of the government. Notwithstanding all of which, the United States Circuit Court of Appeals for the Fourth Circuit rejected the rationale of the District Court and reversed its decision.

The Fourth Circuit found that the alleged injuries of the *Miller* plaintiffs were not conjectural or hypothetical. Indeed, it found they were not merely threatened, but actual. The Fourth Circuit noted that "[b]ecause campaign planning decisions have to made months, or even years, in advance of the election to be effective, the plaintiffs' injuries are actual and threatened." *Miller I*, 462 F.3d at 317-18. (cite omitted). Further, "[t]he mere existence of the open primary law causes these decisions to be made differently than they would absent the law, thus meeting the standing inquiry's second requirement of a causal connection between the plaintiffs' injuries and the law they challenge." *Id.* at 318 (cite omitted). In short, the mere existence of the law, even prior to its enforcement, had a distorting effect on political decision making. That distorting effect was deemed by the Fourth Circuit to be an actual injury sufficient to establish standing.[1]

---

[1] It is worth noting the Fourth Circuit's discussion of ripeness in *Miller* as well. The Fourth Circuit held that the case was ripe, after taking into account the clarity of the largely legal issues presented, on the one hand, and the hardship on the parties of withholding court consideration, on the other. See *Miller*, 562 F3d at 318-19.

7

<u>**ARGUMENT**</u>

I.    **Ms. Fitzgerald, Mr. Yensho and the 20th Committee Have Alleged Facts Sufficient to Establish Causation.**

Defendants' assert that the RPV has submitted (in part) to the Incumbent Protection Act and incorporated it into the Plan. Accordingly, any injury suffered by Ms. Fitzgerald or the 20th District Committee is caused, not by Defendants' enforcement of the Act, but by the independent choice of the RPV to submit to it. [Memorandum, Dkt 10, p. 11 *et seq.*]. This argument applies with equal force to the claims brought by Mr. Yensho, in his individual capacity as a potential candidate for the RPV nomination for the 24th District.

a.    **The *Adams* Litigation.**

Defendants' argument that Mr. Fitzgerald, Mr. Yensho and the 20th District Committee have not alleged facts sufficient to establish causation is based upon the outcome of prior litigation challenging the Incumbent Protection Act. *Adams v. Alcorn*, 2015 LEXIS U.S. Dist. 43366 (W.D.Va. 2015) aff'd *24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624 (2016). In *Adams,* the 24th Republican Senatorial District Committee and its chairman brought a constitutional challenge to the Act against the Defendants. In arguing that the *Adams* plaintiffs lacked standing, the Defendants pointed to the specific language of the Plan related to "Legislative District Committees," which provides as follows:

> The Legislative District Committee shall determine whether candidates for Legislative District public office shall be nominated by Mass Meeting, Party Canvass, Convention or Primary, *where permitted to do so under Virginia Law*.

Plan, Art, V § D(1)(a) (emphasis supplied).

The question of standing in *Adams* turned on the proper interpretation of the italicized language. Defendants argued that by the italicized language the RPV acceded to the Incumbent Protection Act and incorporated it into the Plan, irrespective of the constitutionality of the Act.

8

Accordingly, on Defendants' account any injury suffered by the *Adams* plaintiffs was caused by the independent choice of the RPV and not Defendants' conduct, such that the *Adams* plaintiffs could not establish causation. Further, a favorable decision of the courts would not redress the *Adams* plaintiffs' injury, since incumbents would have the power to select the nomination method under the Plan no less than under the law.

The *Adams* plaintiffs countered by arguing that "Virginia Law" meant only constitutionally enacted laws, in which case the Incumbent Protection Act, and not the Plan, caused their injury. Further, if the Act were declared unconstitutional, an incumbent's power to determine the method of nomination would be a nullity under the Plan, no less than under the law and, thus, the *Adams* plaintiffs' injuries would be redressed.

The District Court in *Adams* noted that under the Plan, the State Central Committee ("SCC") of the RPV is given the power to interpret the Plan. "It is worth noting that . . . the Plan States that the Party's State Central Committee has 'final authority' within the RPV for interpretation of the Plan." *Adams,* 2015 U.S. LEXIS 43366, p. 25 (cite omitted). However, when the District Court rendered its decision, and the record in the case closed, the SCC had not yet interpreted Article V, Section D(1)(a) of the Plan. In the absence of a definitive interpretation of the Plan by the SCC, the District Court adopted the interpretation suggested by Defendants and dismissed the case. A divided panel of the United States Court of Appeals for the Fourth Circuit upheld the decision of the District Court.

### b. The State Central Committee Has Definitively Interpreted the Relevant Plan Language.

As the District Court in *Adams* acknowledged, Article X of the Plan makes the SCC the definitive interpreter of the Plan. To understand the scope of the SCC's power, and how it is exercised, it is necessary to understand the structure of Article X.

Article X, Section A creates a process by which certain individuals and groups can demand an interpretation of the Plan, which must be given to them. This process begins with a request to the general counsel of the RPV for a ruling. There is a process by which certain parties can appeal a ruling of the general counsel, and the final authority to definitively interpret the Plan rests with the SCC. Plan, Art. X § A(3)

Article X, Section B creates a similar process by which "contests and controversies" arising within party committees are resolved. These include disputes over the election of party leaders or the outcome of nomination processes. Again, certain individuals and groups have the right to see a ruling, in this case from the relevant party committee. Appeals arising from such disputes move from unit (city or county) committee, to legislative district committee and finally to Congressional district committee, with the SCC as the appeal of last resort. Plan, Art. X, B(1) – (3).

Article X, Section C sets out the power of the SCC to both hear appeals and exercise its own initiative to address questions of importance to the Party. It reads as follows:

> The State Central Committee shall make the final decision, upon timely appeal, on all Party *controversies and contests in any Election District of the State*, <u>rulings of the General Counsel</u> and **on all other matters deemed to effect the efficiency of the Party organization or the success of the Party**.

Plan, Art. X § C (emphases supplied).

The italicized language is a clear reference to the SCC's final authority to resolve appeals of contests and controversies that arise under Article X, Section B. Likewise, the underlined language is a clear reference to the SCC's final authority to resolve appeals of general counsel rulings that arise under Article X, Section A. The bold language does not refer to an appeal, as there is no appeal process other than those already noted, and none that encompasses such a

10

broad swath of issues. Accordingly, the bolded language grants the SCC broad power to decide issues on its own initiative.[2]

Nothing effects the efficiency of the party organization more than the proper interpretation of the Plan. And nothing effects the success of the Party more than the choice of its nominees. Accordingly, in response to the decision of the District Court in *Adams*, the SCC explicitly invoked its power to interpret Article V, Section D(1)(a) of the Plan. At its meeting held on June 27, 2015, the SCC resolved that:

> 1. The State Central Committee as the governing body of the Republican Party of Virgina, endowed with the authority to make definitive determinations about the application and interpretation of the Party Plan of Organization ("Plan"), hereby directs the Chairman to [v]indicate (sic) the Party's rights violated by application of Virginia Code Section §24.2-509 and a misapplication of the provisions of the plan by US District Court for the Western District of Virginia in support of the mistaken inclusion that the Party acceded to such violations of its rights.

> 2. Specifically, the Chairman shall direct that an appropriate Motion and *Amicus Curiae* brief be filed in the United States Court of Appeals for the Fourth District [sic], vigorously supporting the position of the 24th Republican Senate District Committee. The Motion and the brief shall be filed as soon as possible, but regardless, no later than the period of time permitted such filing under the federal rules of [sic] Federal Rules of Appellate Procedure.

> 3. The Chairman, on behalf of the party shall employ the services of Patrick J. McSweeney, Esquire for this purpose but shall expend no funds of the Party in doing so.

---

[2] The proper understanding of the interplay between Sections A and B, on the one hand, and Section C, on the other, is as follows. Sections A and B grant certain individuals and groups the right to demand rulings (and, under certain circumstances, appeal such rulings). Section C authorizes the SCC not only to act as the appeal of last resort for issues raised pursuant to Sections A and B, but also to address itself to issues on its own initiative.

To use a legal analogy, Section A is analogous to an appeal as of right, which is extended to certain parties under certain circumstances, and to which the RPV, through the ruling and appeals process, is obligated to respond. The bolded language of Section C is akin to original jurisdiction, although that actually misstates the matter since the SCC does not have to wait until another party makes a claim before taking up an issue of importance to the RPV.

Of course, legal analogies should not be pressed too far. The SCC is a policy making and executing body. *See* Plan, Art. I. It is not a court. Its powers should be construed to vindicate the intent of the parties to the Plan as expressed in the text of the Plan, and not subjected to technical rules of procedure imported from outside the document and more appropriate for a judicial body. Suffice it to say that the under the Plan (1) the SCC is the definitive interpreter of the Plan and (2) it is not required to wait for an issue to be raised by another, but can act on its own initiative.

4. State Central Committee hereby resolves that the Act is not incorporated into the Party Plan nor is facilitated by or acceded to [by] the Plan.

Now that the SCC has rendered its interpretation of Article V, Section D(1)(a), any failure by this Court to defer to that interpretation is a refusal to give effect to every provision of the Plan, including Article X which provides that the SCC has the definitive authority to interpret the Plan.[3]  And, in light of the SCC's interpretation of Article V, Section D(1)(a), it is the Act, and not the Plan, which causes the injury alleged by Anne, Ed and the 20th District Committee.

### c.  Defendants' Causation Argument Does not Apply to the other Plaintiffs.

Defendants' causation argument is entirely based upon the courts' prior interpretation of the  language "where permitted to do so under Virginia Law" found in Article V, Section D(1)(a) of the Plan. However, that language does not appear in the analogous provisions of the Plan which grant Congressional District Committees (such as the 6th District Committee) and City and County Committees (such as the Green County Committee) the authority to choose methods of nomination. *See* Plan, Art. III § D(1)(a) and Art. VI § D(1)(a). Accordingly, Defendants' causation argument does not apply to Ms. Kwiatkowski individually as a potential Congressional candidate, the 6th District Committee, or Mr. Yensho in his capacity as chairman of the Green County Committee.

### II.     All of the Parties Have Alleged Injury in Fact.

All the Plaintiffs have alleged facts sufficient to establish actual and threatened injuries due to the existence of the Incumbent Protection Act and its history of enforcement by the Defendants.

---

[3] The SCC's interpretation of the Plan is not extrinsic evidence of the meaning of the Plan, relevant only if the Plan is determined by the courts to be ambiguous. Rather, the SCC's interpretation and its definitive nature are intrinsic to the Plan, the expression of the enforcement of all its terms.

### a. Threatened Injury to the Plaintiffs.

In the Memorandum, the Defendants assert that the Plaintiffs lack standing because they have not yet suffered any injury. As to the 20th District Committee they state that it "does not allege that there is a contradiction between the nomination method selected by the incumbent and the legislative district committee." [Memorandum, dkt 10, p. 8, note omitted]. And as to the 6th District Committee, and presumably the Candidate Plaintiffs, they state that there has been no allegation of any "concrete injury" and, indeed, there cannot be any such injury unless and until conflicting nomination methods are selected by the incumbent and relevant party committee for the 2018 or 2019 nomination cycle. [Memorandum, dkt 10, pp. 8-9]. However, the injury in fact component of standing does not require a "concrete" injury, or even an actual one. A threatened injury, so long as it is not conjectural or hypothetical, is sufficient.

The Plaintiffs have alleged that the Defendants have a long history of enforcing the Incumbent Protection Act, and will continue to do so. [Complaint, dkt 1, pp. 8-9, ¶¶ 25-30]. The Defendants also have aggressively defended the Act in court. See *Adams*, 2015 U.S. Dist. LEXIS at 2 and 24th *Senatorial Dist. Republican Comm.*, 820 F.3d at 628. Given the Defendants' history of enforcing and defending the Act, there is nothing conjectural or hypothetical about the threatened injury to the Plaintiffs.

The fact that the threatened injury will only become actual upon the independent act of a non-governmental third party–i.e., an incumbent politician who invokes his rights under the Incumbent Protection Act–does not defeat the Plaintiffs' standing. Where "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' . . . it becomes the burden of the

plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562 (cites omitted).

The Plaintiffs have alleged that the incumbents for the 24th District and the 6th District, as well as other incumbent politicians, have invoked and benefited from the Incumbent Protection Act in the past. [Complaint, dkt 1, pp.3-4 and 9, ¶¶ 4, 5 and 33]. This stands to reason. As alleged in the complaint, different methods of nomination will favor, and disfavor, different candidates and types of candidates. [Complaint, dkt 1, pp. 6-7, ¶¶ 15-20]. Accordingly, an incumbent politician has ample incentive to use his or her power under the Act to his or her political advantage. Indeed, it was precisely because of this individual interest that the Fourth Circuit held that "for purposes of selecting a nomination method, Virginia does not view the incumbent legislator as a representative of the party." *Miller v. Brown*, 503 F.3d 360, 369 (4th Cir. 2007) ("*Miller II*"). Accordingly, the Plaintiffs also have alleged facts sufficient to establish that incumbents have in the past, and will in the future, invoke the Act.

### b. Actual Injury to the Plaintiffs.

The Plaintiffs' allegations also are sufficient to establish actual injury under the standard articulated by the Fourth Circuit in *Miller I*. In *Miller I*, the Fourth Circuit noted that campaign decisions are made months or years before the election. The court went on to state that the mere existence of the Open Primary Law influences those decisions, including decisions related to "campaign financing, messages to stress, and candidates to recruit." *Miller I*, 462 F.3d at 317-18. On that basis, the *Miller I* court found that the *Miller* plaintiffs had actual and threatened injuries, despite the fact that the members of the Board had not, and indeed could not yet have, actually enforced the Open Primary Law against the *Miller* plaintiffs.

14

### 1. The Mere Existence of the Incumbent Protection Act Distorts the Political Process to the Detriment of the Plaintiffs.

Incumbents already possess an array of *de facto* advantages over challengers for their party's nomination, including name recognition, campaign organization, official and campaign staff, and a greater capacity to raise funds. These advantages are reflected in incumbents' re-election rates. In the period from 1950 to 2008, over 90% of Congressional incumbents who stood for re-election were returned to Congress, and over 80% of Senatorial incumbents who stood for re-election were returned to the Senate. PAUL S. HERNNSON, *Congressional Elections: Campaigning at Home and in Washington*, 24 (7th ed., CQ Press 2016). To the *de facto* advantages enjoyed by incumbents generally, the Incumbent Protection Act adds the *de jure* advantage of being able to choose the method of nomination. *Miller v. Cunningham*, 512 F.3[rd] 98, 103-04 (Wilkinson, J. dissenting) ("*Miller III*").

The Candidate Plaintiffs and other potential candidates for the RPV nominations for the 6th District, 20th District and 24th District are already making decisions related to the 2018 and 2019 election cycles, decisions related to campaign staffing and infrastructure, fundraising strategies, and the taking of political positions. All of these decisions are influenced by an incumbent's power to select the method of nomination, since the different methods make different demands on the candidates, turn out different types of participants and, as a result, favor different types of candidates.[4] [Complaint, dkt 1, pp. 6-7, ¶¶ 15-20].

Potential volunteers, employees and donors are making decisions as well, decisions whether to take the political risk of supporting a challenger, to remain neutral, or to support an

---

[4] To give just several examples of this: "[c]onventions are . . . less expensive for candidates" and their "preferences tend to reflect party orthodoxy more than the preferences of the general electorate" while "a primary-particularly an open one-lends itself to participation from a wider swath of voters" increasing both "the chance that voters will nominate a candidate who appeals to the general electorate" and the risk "of 'party raiding,' where large groups of voters participate in an opposition party's primary, seeking to manipulate their nomination." JAMIE GREGORIAN, "How Primary Election Laws Adversely Affect the Associational Rights of Political Parties in the Commonwealth of Virginia and How to Fix Them," 18 Geo. Mason U. Civ. Rts. L.J. 135, 140-42 (2007) (cites omitted).

incumbent. Under the best of circumstances, challengers are at a disadvantage in trying to muster support for their candidacies. See HERRNSON, *Congressional Elections*, 24 ("Little in the setting in which most congressional campaigns takes place favors the challenger. Most challengers lack the public visibility, money, and political experience to wage a strong campaign. Moreover, because those who work in and help finance campaigns recognize the long odds against challengers, they usually see little benefit in helping them."). These other political actors also are making their decisions in light of the Incumbent Protection Act and the advantage it confers on incumbents. Accordingly, the mere existence of the Act distorts political decision making not just by challengers, but by all the participants in the political process.

The distorting effect of the mere existence of the Act injures the Committee Plaintiffs as well as the Candidate Plaintiffs. The goal of the RPV and all of its constituent committees is to "elect[] duly nominated or designated Republican candidates to public office." Plan, Preamble. And the first duties of the Committee Plaintiffs are (i) determining the method of nomination for such candidates, and (ii) conducting those nominations, in the event a non-primary method is chosen. Plan, Art. IV § D(1)(a) and (b), Art. V § D(1)(a) and (b), and Art. VI § D(1)(a) and (b). Moreover, the Plan demands that the nomination process be fair. Plan, Art. VII § I (requiring party committees to maintain neutrality in contested nominations). Accordingly, the Committee Plaintiffs have a real and significant interest in the RPV nomination process and, in particular, that such process be conducted in a manner that is fair to all candidates.

## 2. The 20th Committee Has Pled Facts Sufficient to Establish Injury in Fact.

The Defendants note that "the 20th House District Committee does not allege that there is a contradiction between the nomination method selected by the incumbent and the legislative district committee." [Memorandum, dkt 10, p. 8 (note omitted)]. This is true, but irrelevant.

16

In light of *Miller I,* the mere existence of the Incumbent Protection Act distorted the 2017 nominating process and distorts the 2019 nominating process in the 20th District. Indeed, the fact that Rep. Bell is the sole candidate for the RPV nomination for the 20th District in 2017 may itself be part of the Act's distorting effect. Other potential candidates, who would have had to begin the arduous process of preparing a campaign over a year ago in order to mount a meaningful challenge to an incumbent, may have decided to forgo the time and expense of such a challenge in large part due to the important advantage the Act conferred on Rep. Bell. See ROBERT G. BOATRIGHT, *Getting Primaried: The Changing Politics of Congressional Primary Challenges*, 64-5 (U. of Mich. Press 2013) (discussing the use of fundraising and other advantages by incumbents to deter potential primary and general election challengers from standing for office). Accordingly, the 20th District Committee has alleged facts sufficient to establish actual injury in both the 2017 and 2019 election cycles.

Further, when this matter was filed, the window in which Rep. Bell could assert his Incumbent Protection Act rights had not closed. See *Va. Code* § 24.2-516. Accordingly, as discussed above, the 20th District Committee has alleged facts sufficient to establish a threatened injury in the 2017 election cycle. Moreover, as discussed above, the continued existence of the Act, its continued invocation by incumbents, and the Defendants continued pattern of enforcing it, is sufficient to establish that the 20th District has alleged a threatened injury that is not merely conjectural or hypothetical.

### 3. On the Defendants' Account, There is Never a Proper Time to Challenge the Incumbent Protection Act.

The Defendants argue that the Plaintiffs do not have standing to challenge the Incumbent Protection Act until it is certain it will be enforced against them. This not only misstates the legal rule on standing (which, as stated above, provides that standing may be found when enforcement

17

is threatened and further provides that the mere existence of an unconstitutional statute can be an actual injury for standing purposes). It also has the practical effect of insulating the Act from judicial review at any time.

### a.  The Statutory Schedule for Nominating Contests.

Virginia's election laws provide a strict and short schedule for conducting nomination contests. The process begins at least 135 days before primary day, at which time the Board is required to inquire of the chairmen of the party committees whether nomination will be made by primary.  *Va. Code* § 24.2-516. The party chairmen, in turn, are required to notify the Board whether a primary has been adopted for the nomination no more than 125 days and no less than 105 days prior to primary day. *Id.*

If one accepts the Defendants' contention that no plaintiff has standing to challenge the Incumbent Protection Act until it is invoked by an incumbent to choose a different method than the method selected by the party committee, the earliest that any plaintiff could have standing would be 125 days prior to primary day, the first day that the party committee or incumbent can inform the Board of the incumbent's decision to invoke the Act. *Va. Code* § 24.2-516.  The latest standing could arise would seem to be 105 days prior to primary day.[5]

Moreover, incumbents are likely to make their elections as late as possible, as the incumbent in *Adams* in fact did, for several reasons.  *Adams v. Alcorn,* No. 5:15-cv-00012-EKD, dkt 1, p. 6, ¶ 16 (W.D.Va. February 25, 2015). First, it keeps potential challengers from knowing for certain whether the nomination will be made by primary, convention or some other method, preventing them from focusing their efforts on the likely participants in the actual nomination

---

[5] Actually, it is theoretically possible that on a strict application of the Defendants' arguments enforcement of the Act would not be certain in at least some cases until the date 44 days prior to primary day. See *Va. Code* § 24.2-537 (providing that the party committee has the right to re-determine the method of nomination if an unopposed primary candidate dies 45 or more days prior to primary day).

18

process. Second, it forces potential challengers to fulfill the qualification requirements of the various methods, in order to ensure they will qualify to participate in the nomination process. See *Va. Code* §24.2-520 *et seq*. Finally, delay makes a successful legal challenge to the incumbent's choice more difficult.

### b. On the Defendant's Account in this Case and in *Adams*, the Courts can Never Adjudicate the Incumbent Protection Act.

As to the last point, neither 105 nor 125 days is sufficient to litigate an important constitutional issue such as the one presented to the Court in this case. Attempting to do so would create disorder and uncertainty in the electoral process. *Miller I*, 462 F.3d at 320. Moreover, the Defendants cannot be heard to argue otherwise, as they have already conceded exactly this point in the *Adams* litigation.

The *Adams* plaintiffs did <u>exactly</u> what the Defendants say, in this case, standing demands. Having chosen a convention as the method of nomination for the 24th District, the *Adams* plaintiffs waited until there was "a contradiction between the nomination method selected by the incumbent and the legislative district committee." [Memorandum, dkt 10, p. 8 (note omitted)]. The incumbent chose a primary as the nomination method on February 24, 2015, the last day the incumbent could file his designation. Mindful of the time limits they and the courts were under, the *Adams* plaintiffs filed their complaint one day later. *Adams v. Alcorn,* No. 5:15-cv-00012-EKD, dkt 1, p. 6, ¶ 16 (W.D.Va. February 25, 2015).

Notwithstanding their arguments in this case, in *Adams* the Defendants argued that the plaintiffs unreasonably delayed bringing their suit and asserted the defense of *laches*. The Defendants' language is unequivocal, and deserves to be quoted at length.

Plaintiffs saw the purported conflict between Virginia law and the Party's Plan on which their suit depends as early as the first week of December [2014]. . . **And Plaintiffs could**

19

**have brought this case much earlier than December [2014]**. Va. Code § 24.2-214 confirms that the every-four-years cycle of state senatorial elections has existed since at least 1995. Va. Code § 24.2-509(B) has existed it its current form since 1993. . . The Party Plan's limited delegation of authority to Plaintiffs has been in place since at least March 22, 2014. *See* Complaint Ex. A at 1. **The purported conflict between Virginia law and the Party Plan regarding who decided the nominated [sic] method was fully realized at least as early as March 2014**, so Plaintiffs knew or should have known of the purported burdens on their First Amendment rights. Yet Plaintiffs waited to bring suit until the end of February 2015, when state and local preparations to hold a primary were beginning, only four weeks before candidates must file for the primary, and eight weeks before the Commonwealth must have printed and distributed absentee ballots.

*Adams v. Alcorn,* No. 5:15-cv-00012-EKD, dkt 26, p.24 (W.D.Va. March 20, 2015) (footnote omitted; emphasis supplied).

In short, in *Adams* these same Defendants argued, unambiguously and strenuously, that the plaintiffs could and, indeed, should have brought suit as early as March 2014. That is to say, the Defendants argued that the *Adams* plaintiffs could and should have brought their suit nearly a full year before the incumbent exercised his rights under the Act and enforcement of the Act become certain. This is entirely at odds with the Defendants' current position that there is and can be no injury in fact unless and until the Act is actually invoked by an incumbent.

Were the courts to accept the Defendants' arguments in both *Adams* and this case, there never would be a time when a plaintiff could challenge the Incumbent Protection Act. Any suit would either be too soon to support standing, or too late to permit the courts to fashion a timely remedy. Accepting the Defendants multifarious and contrary arguments would prevent this Court from ever meaningfully adjudicating the constitutionality of the Act, despite the importance of the First and Fourteenth Amendment issues its raises.

### c. This Court Should Invoke the Doctrine of Judicial Estoppel.

The doctrine of judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous preceding." 18

*Moore's Federal Practice* § 134.30, pp. 134-62 (3d ed., 2000). The doctrine exists "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quotes and cites omitted).

An equitable doctrine, judicial estoppel is not reducible to a general formulation. However, three factors generally inform a court's decision whether to apply the doctrine. "First, a party's later position must be 'clearly inconsistent' with its earlier position." *Id.* (cites omitted). In addition, the courts are more likely to invoke the doctrine if the party in question succeeded in "persuading the court to accept that party's earlier position." *Id.* The third consideration is whether the party asserting the inconsistent position "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751 (cites omitted).

There is no question that the first factor militates in favor of invoking judicial estoppel; the Defendants' current position is clearly inconsistent with their position in *Adams*. In *Adams* the Defendants argued that the plaintiffs could and should have asserted their claims a year or more before the incumbent exercised his rights under the Act. In this case, the Plaintiffs took the Defendants at their word and filed at exactly that time, and under the same conditions, only to have the Defendants argue that they have no standing because they filed too soon.

The second factor is equivocal. The Defendants prevailed in the *Adams* litigation, but they prevailed on the Defendants' causation argument. The court never reached their argument on *laches*. Accordingly, one cannot say that there was "judicial acceptance of an inconsistent position." *Id.* at 750. However, the Defendants have put that position on the record, and in a case in which they prevailed, albeit on other grounds.

21

The third factor militates in favor of invoking judicial estoppel. As stated above, taken together the Defendants' positions in *Adams* and this case do not protect the jurisdiction of this Court, the proper purpose of the doctrine of constitutional standing. Rather, taken together the Defendants' positions destroy the jurisdiction of this Court on the important issues raised by the Plaintiffs, making it practically impossible for the Plaintiffs or any litigant to challenge the Incumbent Protection Act. To insulate the Act from any possible legal challenge is surely an unfair advantage for the Defendants, and to prevent any litigant from challenging it is surely an unfair detriment for the Plaintiffs.

The Plaintiffs also submit that the fact that the Defendants are agencies and agents of the Commonwealth of Virginia further militates in favor of invoking the doctrine of judicial estoppel. It is troubling whenever any party "play[s] fast and loose with the courts." *Id.* (quotation marks and cite omitted). It is something more troubling when government agencies and agents do so, in order to try to shield their official acts from judicial scrutiny.[6]

Accordingly, this Court should invoke judicial estoppel with regard to the Defendants' position in *Adams*. This is not to say that judicial estoppel is a substitute for subject matter jurisdiction. See, e.g. *Rubin v. Buckman*, 727 F.2d 71, 72 (3d Cir. 1984) ("subject matter jurisdiction cannot be created by estoppel"). But judicial estoppel can, and in this case does, have a bearing on factual questions related to subject matter jurisdiction. While "[j]udicial estoppel principles cannot conclusively establish jurisdictional facts" a pleading from a prior case "has some probative value as evidence" of such jurisdictional facts. 535 F.2d 859, 861 (5th Cir. 1976) modified *en banc* on other grounds and vacating district court's remand order, 542 F.2d 297 (5th

---

[6] The Defendants likely will note that in Virginia, estoppel generally does not apply to governmental entities in the discharge of their government functions. *Gwinn v. Alward*, 235 Va. 616 (Va. 1988). However, "where fairness and justice so require, a local government entity may be estopped, notwithstanding the general rule against doing so." *County Sch. Bd. V. RT*, 433 F. Supp. 2d 692, 707 (E. D. Va. 2006).

Cir. 1976), rev'd on other grounds *sub nom. Gravitt v. Southwestern Bell Tel. Co.*, 430 U.S. 723 (1977). Accordingly, the Defendants' position is *Adams* has probative value as evidence that the Plaintiffs have suffered an injury in fact.

### III. Ms. Kwiatkowski and Mr. Yensho Have Pled Facts Sufficient to Establish Redressability.

The Defendants state that the candidates cannot demonstrate that their injury is redressable by this Court. Specifically, the Defendants argue that, "[e]ven were this Court to hold the Act unconstitutional, Ms. Kwiatkowski and Mr. Yensho would nonetheless be required to defer to another entity's determination regarding the method of nomination." [Memorandum dkt 10, p. 12]. However, this argument misapprehends the nature of the Candidate Plaintiffs' equal protection claims as well as this Court's powers to fashion a remedy for them.

#### a. The Candidate Plaintiffs' Equal Protection Claims.

The Candidate Plantiffs are not objecting to that fact that someone else holds the power to select the method of nomination, nor are they seeking to arrogate that power for themselves. Indeed, as the Complaint makes clear, the First Amendment's right of free association ensures that it is the RPV and its official committees, as opposed to any individual, that properly hold that power. Rather, the Candidate Plaintiffs' equal protection claims are based on the discriminatory manner in which the Incumbent Protection Act grants that power to incumbents.

Incumbents and challengers are participants in a competitive political process. With regard to that process they are similarly situated, despite which the Incumbent Protection Act facially discriminates in favor of incumbents and against challengers. It is this discriminatory allocation of the power to select the method of nomination, not the very existence of that power, that offends the equal protection clause of the Fourteenth Amendment. "Discriminatory treatment is a harm that is sufficiently particular to qualify as an actual injury for standing

23

purposes." *Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786, 790 (4th Cir. 2004) (cites omitted).

Candidates for nomination have a very different relationship with the RPV. Candidates do not compete with the RPV in a competitive political process. One could say they compete for the RPV in the electoral process. Moreover, official committees of the RPV are required by the Plan to remain neutral in contested nominations. Plan, Art. VII § I. Accordingly, the political candidates, on the one hand, and the RPV and its official committees, on the other, are not similarly situated. Thus, allowing the RPV and its official committees to exercise their First Amendment right to select the method of nominating its candidate does not offend the equal protection clause of the Fourteenth Amendment.

### b. This Court Can Redress the Candidate Plaintiffs' Injuries by Striking Down the Incumbent Protection Act.

There are two ways a court can remedy a violation of the equal protection clause of the Fourteenth Amendment. It may declare the statute in question "a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion." *Heckler v. Mathews*, 465 U.S. 728, 738 (1984) (internal quotes and cites omitted).

In this case, the Candidate Plaintiffs agree that this Court cannot redress their injury by extending the benefits of the Incumbent Protection Act to them. That is a practical impossibility, and it would exacerbate the Act's First Amendment infirmities. But this Court can, and should, render the Act a nullity.

## CONCLUSION

Each of the Plaintiffs has alleged facts sufficient to establish standing at the pleadings stage in this matter. Accordingly, the Defendants' Rule 12(b)(1) Motion to Dismiss should be denied.

Respectfully Submitted,

**ANNE TAETZSCH FITZGERALD, et al**.,

By Counsel

_____s/ Jeffrey R. Adams_____
Thomas E. Ullrich (VSB No. 28737)
Jeffrey R. Adams (VSB No. 43411)
Wharton, Aldhizer & Weaver, PLC
125 S. Augusta Street
Staunton, Virginia 24401
Telephone: 540-885-0199
Facsimile: 540-213-0390
Email: jadams@wawlaw.com
Email: tullrich@wawlaw.com

And

John C. Wirth (VSB No. 37334)
Nelson, McPherson, Summers & Santos, L.C.
12 N. New Street
Staunton, Virginia 24401
Telephone: 540-885-0346
Facsimile: 540-885-2039
Email: johnwirth@nmsslc.com
*Counsel for Plaintiffs*

S1700879