CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JAN 19 2018

JULIA C. DUDLEY, CLERK
BY: /s/ [signature]
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

ANNE T. FITZGERALD, et al., )
)
    Plaintiffs, )    Case No. 5:17-cv-16
)
v. )
)
JAMES B. ALCORN, et al., )
)    By:    Michael F. Urbanski
    Defendants. )             Chief United States District Judge

## MEMORANDUM OPINION

Political parties in Virginia can nominate their candidates for general elections through various methods. For example, a party may use a primary election in which all registered voters are invited to participate, or it could hold a mass meeting in which party loyalists select a nominee. As a default rule, Virginia allows the party to select its preferred nomination method. However, state election law provides an exception to this rule that empowers certain incumbent officeholders to select their party's nomination method, even over the party's objection. That provision of state law, known as the Incumbent Protection Act, Va. Code Ann. § 24.2-509(B), is the target of this lawsuit.

Plaintiffs are associated in various ways with the Republican Party of Virginia. They claim that the Incumbent Protection Act violates their right to free association under the First Amendment and should be struck down. Defendants, the Virginia Department of Elections and members of the Virginia Board of Elections, counter that plaintiffs lack standing and fall short on the merits. The case is presently before the court on cross-motions for summary judgment. ECF Nos. 33, 35.

The Incumbent Protection Act (the "Act"), Va. Code Ann. § 24.2-509(B), affects each of the five plaintiffs in distinct ways. Indeed, each plaintiff's relationship to the Act weighs heavily on the outcome of their respective claims. Two of the plaintiffs are committees within the Republican Party of Virginia (the "Party"), and three are individuals associated with the Party.

The Party is an unincorporated voluntary association governed by its Plan of Organization (the "Plan"). ECF No. 39-1. The Plan establishes party committees for each electoral district in the Commonwealth. Under the Plan, those committees must use one of four possible methods to nominate Republican candidates for general election: a primary, a party canvass, a convention, or a mass meeting. See The Plan, Art. I § A(1), ECF No. 39-1, at 4.[1] The Commonwealth funds and conducts primaries, and the Party is responsible for funding and organizing the latter three methods. See Va. Code Ann. §§ 24.2-517, 24.2-510.

Plaintiff 20th House of Delegates District Republican Committee ("20th House Committee") is organized under Article V of the Plan. The 20th House of Delegates district comprises the cities of Staunton and Waynesboro and portions of Augusta, Nelson, and Highland Counties.[2] Delegate Richard Bell, a member of the Republican Party, has represented the 20th House of Delegates district since 2010. Article V of the Plan vests the 20th House Committee with authority to determine whether candidates for its district "shall

---

[1] All page numbers noted in this Memorandum Opinion associated with ECF documents reflect the page number listed in the ECF-created footer, not the page number listed on the original document.
[2] The Virginia General Assembly is the legislative branch of the Commonwealth and, like the United States Congress, it is a bicameral body. The Virginia House of Delegates is the lower house, consisting of 100 members, and the Senate of Virginia is the upper house, consisting of 40 members.

be nominated by Mass Meeting, Party Canvass, Convention or Primary, where permitted to do so under Virginia Law." The Plan, Art. V § D(1)(a). The phrase "where permitted to do so under Virginia Law" was the subject of previous litigation, see 24th Senatorial Dist. Republican Comm. v. Alcorn, 820 F.3d 624 (4th Cir. 2016) ("24th Senatorial Committee"), and remains important in this case.

The other committee-plaintiff is the 6th Congressional District Republican Committee ("6th Congressional Committee"), which is organized under Article IV of the Plan. The 6th congressional district covers much of the west-central portion of Virginia, from Roanoke to Front Royal. Representative Robert Goodlatte, also a member of the Republican Party, has represented the 6th congressional district since 1993. In 2016, Representative Goodlatte won nomination by primary, which qualifies him to exercise power under the Act.[3] Under Article IV of the Plan, the 6th Congressional Committee has authority to "determine whether candidates for [] public office shall be nominated by Convention, Party Canvass or Primary." The Plan, Art. IV § D(1)(a).

Plaintiffs Anne T. Fitzgerald, Edward A. Yensho, and Karen U. Kwiatkowski, each sue individually as Virginia voters and members of the Party. Fitzgerald also sues in her capacity as the chairman of the 20th House Committee. Likewise, Yensho sues as chairman

---

[3] After this case was filed, Representative Goodlatte announced that he does not intend to run for reelection in 2018. See Press Release, Rep. Goodlatte, It's An Honor to Serve You (Nov. 9, 2017), https://goodlatte.house.gov/news/documentsingle.aspx?DocumentID=1038. The court addresses below whether Representative Goodlatte's retirement renders the 6th Congressional Committee's claim moot.

of the Greene County Republican Committee, though the Greene County Committee is not a party to this suit. None of these individuals currently hold public office.[4]

In sum, plaintiffs consist of the committee-plaintiffs (20th House Committee and 6th Congressional Committee), the chairman-plaintiffs (Fitzgerald and Yensho), and the individual-plaintiffs (Fitzgerald, Yensho, and Kwiatkowski). Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, alleging that the Act is facially invalid because it violates their right to free association.

The defendants are the three members of the Virginia Board of Elections (the "Board")—Chairman James B. Alcorn, Vice Chair Clara B. Wheeler, and Secretary Singleton B. McAllister—and the Virginia Department of Elections (the "Department"). Both the Board and the Department are charged with enforcing the Incumbent Protection Act, among the other state election laws. See Va. Code Ann. §§ 24.2-103, 24.2-404.

The Act empowers certain officeholders to choose the method of nomination used to select their party's nominee for general elections. Section 24.2-509 of the Virginia Code states in its entirety:

> A. The duly constituted authorities of the state political party shall have the right to determine the method by which a party nomination for a member of the United States Senate or for any statewide office shall be made. The duly constituted authorities of the political party for the district, county, city, or town in which any other office is to be filled shall have the right to determine the method by which a party nomination for that office shall be made.

---

[4] Kwiatkowski and Yensho also sued as prospective candidates challenging incumbent officeholders. Compl. ¶¶ 4, 5. However, on July 25, 2017, the court dismissed Kwiatkowski and Yensho as candidate-plaintiffs for lack of standing. Order, ECF No. 32. The court allowed Kwiatkowski and Yensho to proceed in their capacities as individual voters. In addition, the court allowed Yensho to proceed as chairman of the Greene County Committee.

B. Notwithstanding subsection A, the following provisions shall apply to the determination of the method of making party nominations. A party shall nominate its candidate for election for a General Assembly district where there is only one incumbent of that party for the district by the method designated by that incumbent, or absent any designation by him by the method of nomination determined by the party. A party shall nominate its candidates for election for a General Assembly district where there is more than one incumbent of that party for the district by a primary unless all the incumbents consent to a different method of nomination. A party, whose candidate at the immediately preceding election for a particular office other than the General Assembly (i) was nominated by a primary or filed for a primary but was not opposed and (ii) was elected at the general election, shall nominate a candidate for the next election for that office by a primary unless all incumbents of that party for that office consent to a different method.

When, under any of the foregoing provisions, no incumbents offer as candidates for reelection to the same office, the method of nomination shall be determined by the political party.

For the purposes of this subsection, any officeholder who offers for reelection to the same office shall be deemed an incumbent notwithstanding that the district which he represents differs in part from that for which he offers for election.

Subsection A sets forth the general rule: political parties are empowered to choose the method of nomination. Subsection B creates exceptions to the general rule, distinguishing between General Assembly incumbents and non-General Assembly incumbents.[5]

The Act grants incumbents of General Assembly districts unilateral power to override their party's preferred method of nomination. For example, if the 20th House Committee prefers a convention and Delegate Bell prefers a primary, Delegate Bell could invoke his

---

[5] Parts of the statute apply in narrow circumstances. For example, the third sentence in Subsection B covers situations in which redistricting consolidates two districts represented by incumbents of the same party. And the plural reference to incumbents in the fourth sentence of Subsection B—"unless all incumbents of that party for that office consent"—anticipates at-large elections for multi-seat offices such as city council. See Letter from Matthew J. Abell, Senior Elections Administrator, Virginia Department of Elections, to political party chairs, ECF No. 39-9, at 2.

power under the Act to force a primary. The Act also provides General Assembly incumbents with the power to require their party to use a party-run nomination method such as a mass meeting, even if the party would prefer to use a state-run primary.

The Act vests narrower authority to incumbents of non-General Assembly electoral districts, such as Representative Goodlatte of the 6th congressional district. If a non-General Assembly incumbent was nominated in the previous election cycle by a primary (or filed for a primary and was not opposed), then the political party may use a non-primary nomination method only with the incumbent's consent. So, for example, Representative Goodlatte, as a primary-nominated incumbent, could refuse consent to the 6th Congressional Committee's request to hold a convention and thereby force a primary. Unlike General Assembly incumbents, other incumbents do not have the authority under the Act to mandate a specific type of party-run nomination method—that is, Representative Goodlatte cannot force the 6th Congressional Committee to hold a convention if the Committee prefers a primary. Representative Goodlatte's power under the Act is limited to forcing a primary over the 6th Congressional Committee's request to use a non-primary method of nomination.[6]

In this case, neither Delegate Bell nor Representative Goodlatte has exercised his power under the Act to override his party committee's preferred nomination method for an upcoming election. So, there is no present conflict between an incumbent and a committee-plaintiff. Plaintiffs contend that no such conflict is necessary to prevail on their facial challenge to the Act. Defendants take a different view. They argue that due to the absence of

_____

[6] If no incumbent runs for reelection (or if no primary-nominated incumbent runs in non-General Assembly districts), then the political party has the final say in determining the nomination method.

conflict between an incumbent and a party committee, plaintiffs lack standing. The court addresses these contentions below, along with defendants' other arguments on standing.

On March 22, 2017, defendants filed a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, which the court denied in part and granted in part. The court granted the motion to the extent defendants challenged the claims brought by Yensho and Kwiatkowski as prospective candidates. The Fourth Circuit dismissed nearly identical claims pursued by a prospective candidate in 24th Senatorial Committee, 820 F.3d at 633.

As regards the committee-plaintiffs, the court allowed them to proceed past the Rule 12(b)(1) stage and directed the parties to engage in jurisdictional discovery as to whether the committee-plaintiffs have standing to sue. In the motion to dismiss, defendants did not challenge the standing of the individual-plaintiffs or the chairman-plaintiffs. Defendants correct that apparent oversight in their summary judgment motion and seek judgment as to all plaintiffs in each of their capacities. On summary judgment, defendants argue that no plaintiff has standing, and alternatively that no plaintiff succeeds on the merits. Plaintiffs also filed a summary judgment motion seeking judgment as a matter of law. The court addressed the cross-motions at a hearing on October 26, 2017.

## II.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The court must "view the facts and draw all reasonable inferences in the light most favorable to the

7

non-moving party." Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013).[7] "When faced with cross-motions for summary judgment, [courts] consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Bacon v. City of Richmond, Virginia, 475 F.3d 633, 637–38 (4th Cir. 2007). While passing on each motion, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

Both sides made clear at the October 26 hearing that they anticipate that the court will resolve this case on summary judgment. But if the parties are wrong and a factual dispute remains, the court must deny the motions and permit the case to go to trial. Podberesky v. Kirwan, 38 F.3d 147, 156 (4th Cir. 1994) ("The fact that both parties simultaneously are arguing that there is no genuine issue of fact does not establish that a trial is unnecessary.").[8] As set forth below, the court agrees with the parties; plaintiffs' claims are appropriately resolved on summary judgment.

This is not the first case in which plaintiffs associated with the Republican Party of Virginia challenge the validity of the Incumbent Protection Act. In 24th Senatorial

---

[7] The court has omitted internal quotation marks, alterations, or citations here and throughout this opinion, unless otherwise noted.

[8] "In a nonjury case if both parties move for summary judgment and the court finds that there are issues of fact but that the facts have been fully developed at the hearing on the motions, the court may proceed to decide the factual issues and give judgment on the merits." Tripp v. May, 189 F.2d 198, 200 (7th Cir. 1951). "This of course amounts to a trial of the case and is not technically a disposition by a summary judgment." Tripp, 189 F.2d at 200; see also Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2720 (4th ed.). This case demands a bench trial and during the October 26 hearing the parties unequivocally stated their belief that no factual disputes exist. Therefore, the court could transform summary judgment to a trial on the papers and resolve factual disputes if any exist. For the reasons stated below, however, no issues of material fact are presented and the court will grant summary judgment pursuant to Rule 56.

Committee, 820 F.3d 624, the Fourth Circuit dismissed a challenge to the Act for lack of standing. That decision directly relates to the claims brought here by the 20th House Committee and the individual-plaintiffs. Indeed, the court does not write on a clean slate as regards any plaintiff in this case given that the Fourth Circuit has examined the interplay between Virginia law and the Party's Plan on a number of occasions. See Marshall v. Meadows, 105 F.3d 904 (4th Cir. 1997); Miller v. Brown, 462 F.3d 312 (4th Cir. 2006) ("Miller I"); Miller v. Brown, 503 F.3d 360 (4th Cir. 2007) ("Miller II"); Miller v. Cunningham, 512 F.3d 98 (4th Cir. 2007) ("Miller III") (Wilkinson, J., dissenting from denial of rehearing en banc). A topic common to each of those cases is justiciability, that is, whether the dispute is suitable for judicial resolution. This case is no exception.

### III.

Article III of the Constitution limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. To determine if a case is justiciable, the court must ask "whether the conflicting contentions of the parties present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979). Justiciability includes three inter-related doctrines of standing, ripeness, and mootness; however, the "doctrine that requires a litigant to have 'standing' to invoke the power of a federal court is perhaps the most important."Allen v. Wright, 468 U.S. 737, 750 (1984), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377 (2014).

9

"To have standing, a plaintiff must demonstrate (1) he has suffered an actual or threatened injury, (2) a causal connection between the injury complained of and the challenged action, and (3) the injury can be redressed by a favorable decision." 24th Senatorial Committee, 820 F.3d at 628. "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). On summary judgment, the plaintiff "must set forth by affidavit or other evidence specific facts" that demonstrate standing. Lujan, 504 U.S. at 561.

## A. Standing of the Committee-Plaintiffs

The committee-plaintiffs' claims require a deep inquiry into the standing doctrine. Both committee-plaintiffs are in the same position as regards the first element: neither is currently at odds with an incumbent over what nomination method to use in an upcoming election cycle. Defendants assert that in the absence of a fully developed conflict between an incumbent and a committee, the committees cannot show injury. In response, the committee-plaintiffs argue that the threat of incumbents invoking the Act influences campaign planning decisions well in advance of an actual conflict arising, and that this threat is sufficient injury to bring a facial challenge to the Act.

As for the causation and redressability elements, the committee-plaintiffs are in different boats. Article V of the Party's Plan states that the 20th House Committee is permitted to select a nomination method "where permitted to do so under Virginia Law." §

D(1)(a). In 24th Senatorial Committee, the Fourth Circuit concluded that this language incorporated the Act, and therefore, the alleged injury was caused by the Party's Plan, not the Act. 820 F.3d at 630–33 (dismissing a committee-plaintiff for failing to show causation element of standing). The committee-plaintiffs here argue that 24th Senatorial Committee is distinguished by new evidence: on June 27, 2015 the State Central Committee passed a resolution declaring "that the Act is not incorporated into the Party Plan." Meeting Minutes attached as Ex. 1 to Albertson Decl., ECF No. 39-2, at 14. The court must resolve the effect of this resolution in determining the 20th House Committee's standing. However, the 6th Congressional Committee presents no similar causation or redressability issues because Article IV of the Plan does not include the "where permitted to do so" language. In other words, the 6th Congressional Committee's power to select a nomination method is limited only by the Act, not the Party's voluntary choice to restrict its authority. The court now turns to examine these issues in depth.

1. *The Committee-Plaintiffs Suffer an Actual or Threatened Injury.*

To satisfy the first element of standing, the committee-plaintiffs must possess "a legally protected interest." Lujan, 504 U.S. at 560. They plainly do. The Supreme Court has long recognized that the First Amendment protects the freedom of political association. See Williams v. Rhodes, 393 U.S. 23, 30 n.6 (1968) (listing cases). Indeed, "[i]n no area is the political association's right to exclude more important than in the process of selecting its nominee." Cal. Democratic Party v. Jones, 530 U.S. 567, 575 (2000). The committee-plaintiffs' claims of state interference in their "candidate-selection processes unquestionably

11

pleads a constitutional injury." Miller I, 462 F.3d at 316. "Whether this alleged injury is actual or threatened, however, requires closer examination." Id. at 317.

Defendants argue that the committee-plaintiffs lack an actual or threatened injury given the absence of conflict between a committee-plaintiff and an incumbent as to what nomination method to use in an upcoming election cycle.

The "standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008). Plaintiffs filed this case on February 24, 2017. At that time, the upcoming general elections were to be held in November 2017 for the General Assembly and November 2018 for Congress. In December 2016, Delegate Bell informed the 20th House Committee that he would choose a convention as the method of nomination for the 2017 general election. See 20th House Committee Dep., ECF No. 36-1, at 23:13-19. Independent of Delegate Bell's choice, the 20th House Committee also preferred a convention. Id. at 23:22–24:1. As regards the congressional elections in 2018, neither Representative Goodlatte nor the 6th Congressional Committee had announced a preferred method of nomination before this lawsuit commenced. As such, no conflict between an incumbent and a committee-plaintiff existed at the time this case was filed.[9]

---

[9] In fact, a formal conflict could not manifest until four months or so before a scheduled primary day. Under Virginia law, the Board of Elections must ask each party committee chairman, at least 135 days before a primary day, "whether a direct primary has been adopted" by their committee. Va. Code Ann. § 24.2-516. The chairman must respond between 125 days and 105 days before primary day, indicating whether their party has selected a primary. Id. Likewise, any incumbent exercising his power under the Act must notify his party and the Board within the same 125–105 day window before the scheduled primary. See id. For a typical November general election, the conflict could arise no sooner than early February because primaries are scheduled on the second Tuesday in June. Va. Code Ann. § 24.2-252.

But a plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief." Babbitt, 442 U.S. at 298. He need only show "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Id.; see also Davis, 554 U.S. at 734 ("A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct."). The Fourth Circuit's decision in Miller I, 462 F.3d 312, is highly instructive on this mark. Miller I involved a challenge to Virginia's "open primary" law, Va. Code Ann. § 24.2-530, which mandates that all registered voters be invited to participate in a political party's primary. In August 2004, the Republican incumbent to Virginia's 11th senatorial district, Senator Stephen Martin, announced his selection of a primary for the 2007 election cycle. In January 2005, the 11th Senatorial District Republican Committee ("11th Senatorial Committee") asked the Board of Elections to limit participation in the 2007 primary to voters who sign a pledge to the Republican Party. The Board refused to implement the pledge requirement, citing Virginia's open primary mandate, Va. Code Ann. § 24.2-530.

---

Defendants do not contend that a plaintiff challenging the Act must wait until a formal conflict arises after the statutory deadlines. Rather, defendants argue that an incumbent and a party committee need to at least announce their intentions to select different methods of nomination for an upcoming cycle. At that point, defendants recognize a committee-plaintiff would suffer an injury adequate to sue. See Miller I, 462 F.3d 312 (party committee's expressed desire for a closed primary for an election cycle nearly two years away provided sufficient injury to challenge Virginia's open primary law). Plaintiffs argue in response that no such circumstances are necessary. This is especially so, according to plaintiffs, given how rare incumbents announce their selection before the statutory reporting deadlines: incumbents are incentivized to wait as long as possible to invoke their rights under the Act. By waiting until the deadline, incumbents maximize the uncertainty as to what nomination method will be used, and that uncertainty may scare off potential challengers. See Jenkins Decl., ECF No. 39-27, at 8–9. Therefore, incumbents realize their full power under the Act by keeping quiet until the statutory deadline. See id. For the reasons stated herein, the court agrees with plaintiffs in determining that an incumbent and a committee need not announce contradictory preferences for nomination methods for a committee to have standing to challenge the Act.

The 11th Senatorial Committee and its chairman filed suit in early 2005, asking the court to declare the open primary law unconstitutional. The district court dismissed the case, explaining in part that "Senator Martin could conceivably change his mind about seeking re-election between now and the official date of declaration of candidacy." Miller v. Brown, 394 F. Supp. 2d 794, 799 (E.D. Va. 2005), rev'd and remanded, 462 F.3d 312 (4th Cir. 2006). The district court determined that the 11th Senatorial Committee lacked standing and that the case was not ripe.

The Fourth Circuit reversed those rulings, recognizing that the open primary law "dramatically changes the plaintiffs' decisions about campaign financing, messages to stress, and candidates to recruit" well before a given election cycle formally commences. Miller I, 462 F.3d at 317. "Because campaign planning decisions have to be made months, or even years, in advance of the election to be effective, the plaintiffs' alleged injuries are actual and threatened." Id. at 317–18. Accordingly, the court found that the "mere existence of the open primary law causes these decisions to be made differently than they would absent the law," and remanded for resolution on the merits. Id. at 318.

Defendants attempt to distinguish Miller I on the basis that the facts in that case presented a more teed-up controversy than the dispute here. Indeed, the conflict in Miller I was apparent: the 11th Senatorial Committee asked for a closed primary and the Board of Elections refused. In this case, neither committee-plaintiff is sparring with an incumbent or with the Board as to what nomination method to use in an upcoming election.

In situations such as these, where a challenge to a statute does not arise from its active enforcement, courts often look to the general enforcement history of the statute in

determining whether a plaintiff's rights are sufficiently threatened. See, e.g., Davis, 554 U.S. at 734 (considering enforcement of the challenged campaign finance law against candidates not party to the suit in determining that the plaintiff had standing despite lack of pending enforcement action against the plaintiff); S.F. Cty. Democratic Cent. Comm. v. Eu, 826 F.2d 814, 823 (9th Cir. 1987) (party-plaintiff's history of compliance with the challenged election law did not undermine the party's standing), aff'd, 489 U.S. 214 (1989). Although "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief[,] … past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974).

Plaintiffs have identified over 100 instances in which incumbents have invoked their power under the Act in recent election cycles. See 2015 State Senate SBE-509 Forms, ECF No. 39-28; 2013 House of Delegates SBE-509 Forms, ECF No. 39-29; 2016 Rep. Goodlatte SBE-509 Form, ECF No. 39-24; 2016 6th Congressional Committee SBE-516 Form, ECF No. 39-26 (indicating that the "incumbent of my party, is seeking re-election and has designated the method of nomination … [as a] primary"); 2016 11th Congressional District Democratic Committee SBE-516 Form, ECF No. 39-18 (same).[10] Indeed, the incumbents associated with the committee-plaintiffs invoked the Act in their most recent election cycles.

---

[10] In 2015, at least 27 incumbent state senators exercised their power to choose their parties' nomination method. See 2015 State Senate SBE-509 Forms, ECF No. 39-28. Four of those senators selected party-run methods. See id., at 14 (Sen. George Barker, firehouse primary), at 20 (Sen. Richard Black, party canvass), at 26 (Sen. Mark Obenshain, party canvass), and at 30 (Sen. Charles Carrico, mass meeting). In 2013, at least 82 members of the House of Delegates used their power under the Act to select a nomination method, see 2013 House of Delegates SBE-509 Forms, ECF No. 39-29, eight of whom selected party-run methods, see id., at 18 (Del. Roslyn Tyler, caucus), at 32 (Del. Terry Kilgore, mass meeting), at 34 (Del. James Morefield, mass meeting), at 55 (Del. Steven Landes, party canvass), at 56 (Del. Tony Wilt, firehouse primary), at 61 (Del. Scott Lingamfelter, mass meeting), at 72 (Del. Robert Bell, party canvass), and at 99 (Del. Mark Cole, party canvass).

See 2016 Rep. Goodlatte SBE-509 Form, ECF No. 39-24; 20th House Committee Dep., ECF No. 36-1, at 23:13-19. And the Department has uniformly enforced the incumbents' selected nomination method. See Cortes Dep., ECF No. 39-7, at 31:1–32:15. The threat of an incumbent invoking the Act is therefore "a realistic danger," far from "imaginary or speculative." Babbitt, 442 U.S. at 298.

Defendants argue that an incumbent's use of his power under the Act is of no moment if his selected method of nomination does not contradict his committee's selected method. For example, in both 2015 and 2017 Delegate Bell and the 20th House Committee independently chose a convention. 20th House Committee Dep., ECF No. 36-1, at 23:22-24:3.[11] And since at least 2012, the 6th Congressional Committee has not selected a method of nomination, but instead deferred to Representative Goodlatte's choice. See 6th Congressional Committee Meeting Agendas and Minutes, Jan. 2012–May 2017, ECF Nos. 43-1, 43-2 (no mention of nomination methods); 6th Congressional Committee Dep., ECF No. 45-2, at 67:2-3 (the Committee "wait[s] for the congressman to tell us which method he has determined [that] we will follow."). Defendants argue that for the committee-plaintiffs to have the requisite injury, they must openly oppose their incumbent's choice for a nomination method.

In response, the committee-plaintiffs argue that whether the incumbent's choice ultimately matches the committee-plaintiff's selection is irrelevant. They contend that the Act harms their associational rights long before an incumbent selects a nomination method

---

[11] A conflict did arise in 2013 when Delegate Bell invoked his power under the Act to force a primary and override the 20th House Committee's selection of a convention. 20th House Committee Dep. at 12:22–13:1, 36:18-20.

for an ensuing election. Professor Jeffery Jenkins, an expert witness sponsored by plaintiffs, illustrates the ways in which the Act affects campaign planning decisions before it is formally invoked. See Jenkins Decl., ECF No. 39-27. Jenkins notes that each of the four nomination methods available under the Plan "create[s] a different distribution of potential voters (or decision makers) in the nomination process." Id. at 7-8. For example, primaries involve the largest pool of potential voters, whereas conventions and mass meetings "lend themselves more toward 'committed partisans.'" Id. at 8-9. Given these variations, the Act allows incumbents "to assess how they would perform under different nomination methods and choose the one that they believe maximizes their chances of reelection." Id. at 9. Therefore, even before an incumbent invokes the Act, candidates challenging the incumbent "have to potentially prepare for (and qualify for) four different nomination methods." Id. at 9 n.5. Jenkins states that "the mere existence of the Act may add ... uncertainty for potential high-quality challengers (and the staff, volunteers, and donors who would consider committing to their campaign)." Id. at 9.

Jenkins' conclusions are borne out in the testimony of the 20th House Committee and 6th Congressional Committee chairmen. Fitzgerald, as the 20th House Committee's chairman, described the "big differences" among the various methods of nomination, including the stricter qualifications individuals must have to participate in party-run events compared to the qualifications applicable to primary voters. 20th House Committee Dep., ECF No. 39-4, at 27:5, 33:23–34:3. She stated that the 20th House Committee "really, fundamentally, believes that it should be the right of the party to designate the way that we nominate our members." Id. at 45:22-25. Robert Sayre, chairman of the 6th Congressional

Committee, testified that candidates for the 6th congressional district begin their campaign efforts before a nomination method is announced. 6th Congressional Committee Dep., ECF No. 45-2, at 32:16-25. He also stated that because of the Act, no one knows what nomination method will govern until the incumbent makes a selection: "[t]he committee position is we wait for the congressman to tell us which method he has determined [that] we will follow." Id. at 67:1-3.[12] In fact, members of the 6th Congressional Committee have discussed efforts to repeal or invalidate the Act on numerous occasions since 2012. See Meeting Minutes, ECF No. 39-6, at 55, 66, 72, 82.

The uncontroverted testimony from Jenkins and the committee chairmen shows that the Act need not be formally invoked to affect the campaign planning decisions of the committee-plaintiffs. In light of the fact that incumbents are not shy to exercise their power

---

[12] In Miller II, defendants argued that that the 11th Senatorial Committee was not burdened by the open primary law because the Committee could have altered "internal party rules to compel Senator Martin to select the Committee's preferred method of nomination in order to appear on the ballot." 503 F.3d at 369. The Board even proposed that the Committee "could 'disassociate' itself from Senator Martin if he refuses to comply with the Committee's wishes regarding the method of nomination." Id. at 370. The Fourth Circuit rejected these contentions:

> [E]ven if it were theoretically possible for the Committee to dictate the selection process in this manner, we do not think the Committee should be required to take such drastic affirmative steps against an incumbent officeholder—with whom it might otherwise agree—in order to preserve its right of free association. Indeed, the upheaval that such action might cause within the local party could conceivably alter the identity of its candidates and the message it conveys to the public, thus implicating the same associational freedoms that the Committee seeks to vindicate here.

Id.; see also S.F. Cty. Democratic Cent. Comm. v. Eu, 826 F.2d 814, 823 (9th Cir. 1987) (rejecting a nearly identical argument as "based on the erroneous premise that conformity with obligations imposed by law proves that those laws do not restrict constitutional freedoms"), aff'd, 489 U.S. 214 (1989). Although the defendants' proposed requirement that the committee-plaintiffs openly oppose their incumbent is not as drastic as requiring the committee to amend its rules or to cast out an incumbent, a public conflict with an incumbent "could conceivably alter the identity of its candidates and the message it conveys to the public." Miller II, 503 F.3d at 370. Therefore, the committee-plaintiffs' history of compliance with the Act does not undermine their ability to demonstrate standing.

under the Act, the committee-plaintiffs must account for the ever-present threat that their preference for a particular nomination method will be rejected by their incumbent officeholders. Defendants do not challenge the accuracy of these facts, but merely argue these circumstances do not qualify as an injury for standing purposes. The court disagrees.

The committee-plaintiffs' uncertainty as to what method will control the nomination of their general election candidates for upcoming elections is sufficient injury to demonstrate standing. This is so regardless of whether a committee ultimately agrees with its incumbent's choice of a nomination method. The committee-plaintiffs have demonstrated that the uncertainty caused by the Act "dramatically changes the plaintiffs' decisions about campaign financing, messages to stress, and candidates to recruit … months, or even years, in advance of the election." Miller I, 462 F.3d at 317–18. That uncertainty is palpable given the Act's repeated invocation by incumbents and enforcement by defendants. Therefore, the committee-plaintiffs demonstrate a real, immediate, and direct threat to their constitutional rights of free association, and thus satisfy the first element of standing.

### 2. The 6th Congressional Committee Demonstrates Causation and Redressability, but the 20th House Committee does not.

In addition to suffering a threatened or actual injury, the committee-plaintiffs must show "a causal connection between the injury complained of and the challenged action" and that "the injury can be redressed by a favorable decision." 24th Senatorial Committee, 820 F.3d at 628. The causation element requires that the injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). "[W]here an alleged injury is caused by a voluntary choice made by the Virginia Republican

19

Party and not the challenged state law, plaintiffs do not establish causation." 24th Senatorial Committee, 820 F.3d at 630 (quoting Marshall v. Meadows, 105 F.3d 904, 906 (4th Cir. 1997)).

In Marshall, 105 F.3d 904, two members of the Party challenged Virginia's open primary law, Va. Code Ann. § 24.2-530. Those members failed to convince the Party's State Central Committee to seek a closed primary for nominating a candidate for United States Senate in the 1996 election. In fact, both the State Central Committee and the incumbent Republican Senator, John Warner, independently agreed to use an open primary as the means of nomination. The Marshall court determined that the "Party has made its choice to conduct a party primary in the manner it desires and there is no reason for us to interfere with that voluntary decision." 105 F.3d at 906–7 (relying on Democratic Party of U. S. v. Wis. ex rel. La Follette, 450 U.S. 107, 124 n.27 (1981), for the proposition that "it is for the Virginia Republican Party—and not any court—to determine the appropriate standards for participation in the Party's candidate selection process"). The court dismissed the action for lack of standing.

In 24th Senatorial Committee, 820 F.3d 624, which also involved a challenge to the Incumbent Protection Act, the Fourth Circuit leaned heavily on the lessons set forth in Marshall. The lead plaintiff, the 24th Senatorial Committee, was organized under Article V of the Plan. As noted, Article V gives General Assembly committees authority to determine whether their candidates "shall be nominated by Mass Meeting, Party Canvass, Convention or Primary, where permitted to do so under Virginia Law." The Plan, Art. V § D(1)(a).

The dispute focused on the phrase "where permitted to do so under Virginia Law." The Department and Board of Elections, as defendants, argued that this provision incorporated the Act into the Plan. And therefore, any alleged injury was the fault of the Party's voluntary choice, not impermissible state action. In response, the 24th Senatorial Committee argued that the language "where permitted to do so under Virginia Law" referred only to "valid, constitutional Virginia law." 820 F.3d at 632.

The court recognized that in Virginia, "[t]he constitution and by-laws adopted by a voluntary association constitutes a contract between the members, which, if not immoral or contrary to public policy, or the law, will be enforced by the courts." Id. at 631 (quoting Gottlieb v. Econ. Stores, Inc., 199 Va. 848, 856, 102 S.E.2d 345, 351 (1958)). Therefore, the court "interpret[ed] the Plan according to general principles of contract interpretation under Virginia law." 24th Senatorial Committee, 820 F.3d at 631.

The Fourth Circuit determined "that the language of the Plan is clear and unambiguous: the Plan delegates to the Committee the authority to determine the nomination method unless Virginia law otherwise limits that authority." Id.; see also id. at 631–32 ("The plain language of the contract, read as a single document, shows clearly that … [the Party could have but did not] preserve its ability to unilaterally choose the method of nomination for legislative districts."). "Because the Party has made a voluntary choice to limit the Committee's authority in this way, the plaintiffs have no complaint that the party's right to govern itself has been substantially burdened by the Act because the source of the complaint is the party's own decision." Id. at 632–33. Consequently, the court affirmed the district court's dismissal of the 24th Senatorial Committee for lack of standing.

The 20th House Committee in this case argues that 24th Senatorial Committee is not controlling in light of a resolution passed by the State Central Committee during a June 27, 2015 meeting. See Meeting Minutes attached as Ex. 1 to Albertson Decl., ECF No. 39-2, at 14 (the "Resolution"). The State Central Committee issued the Resolution after the district court's decision in 24th Senatorial District (which was styled Adams v. Alcorn, No. 5:15CV00012, 2015 WL 1524481, at *1 (W.D. Va. Apr. 2, 2015), and affirmed sub nomine), but before the Fourth Circuit heard the appeal. The Resolution stated in part "that the Act is not incorporated into the Party Plan nor is facilitated by or acceded to the Plan." The Resolution, ECF No. 39-2, at 14.

The Resolution was not presented to the district court in the prior challenge to the Act. See Adams, 2015 WL 1524481, at *8 n.13 ("Neither the State Central Committee nor the [Party] itself has sought to intervene and no party has offered any evidence as to what the Party meant by the disputed provision."). In fact, the court indicated that "[i]t is also worth noting that ... the Plan states that the Party's State Central Committee has 'final authority' within the [Party] for interpretation of the Plan." Id. at *8 (citing The Plan, Art. X §§ A(3), C). "The State Central Committee and the [Party] are not parties to this case and their interpretation of the Plan is unknown." Id. The court dismissed the case on April 2, 2015.

The State Central Committee responded to the district court's decision by issuing the

Resolution on June 27, 2015. See Albertson Decl., ECF No. 39-2, at 3; Anderson Decl., ECF

No. 39-3, at 3.[13] The Resolution states in its entirety:

> 1. The State Central Committee as the governing body of the Republican Party of Virginia, endowed with the authority to make definitive determinations about the application and interpretation of the Party Plan of Organization ("Plan"), hereby directs the Chairman to indicate the Party's rights violated by application of Virginia Code Section § 24.2-509 and a misapplication of the provisions of the plan by US District Court for the Western District of Virginia in support of a mistaken inclusion that the Party acceded to such violation of its rights.
>
> 2. Specifically, the Chairman shall direct that an appropriate Motion and Amicus Curiae brief be filed in the United States Court of Appeals for the Fourth District, vigorously supporting the position of the 24th Republican Senate District Committee. The Motion and the brief shall be filed as soon as possible, but regardless, no later than the period of time permitted for such filing under the federal rules of Federal Rules of Appellate Procedure.
>
> 3. The Chairman, on behalf of the party shall employ the services of Patrick J. McSweeney, Esquire for this purpose but shall expend no funds of the Party in doing so.
>
> 4. State Central Committee hereby resolves that the Act is not incorporated into the Party Plan nor is facilitated by or acceded to the Plan.

ECF No. 39-2, at 14 (typos original). The Party filed an amicus brief with the Fourth Circuit

echoing the interpretation of the Plan set forth in the Resolution. See Brief for the

Republican Party of Virginia as Amicus Curiae, 2015 WL 4197067, 24th Senatorial

---

[13] Following the district court's decision in Adams, three members of the State Central Committee, Steven Albertson, Carl Anderson, and Fitzgerald, formed an "ad hoc" committee to address the Act. Albertson Decl., at ¶ 8; Anderson Decl., at ¶ 8. The ad hoc committee wrote the original version of the Resolution and Anderson made the motion before the State Central Committee for its passage. Meeting Minutes, ECF No. 39-2, at 13. The Resolution passed with insubstantial changes. See Meeting Minutes, ECF No. 39-2, at 13–14.

Committee, 820 F.3d 624. The Fourth Circuit, however, refused to consider the Resolution on procedural grounds: "the Committee's suggestion that the district court erred by failing to secure a definitive interpretation of the Plan from the Party is untimely and therefore waived, as any request should have been made to the district court." 24th Senatorial Committee, 820 F.3d at 632.

The 20th House Committee argues that the Resolution, which has now been properly entered into the record, reflects a new fact that distinguishes this case from 24th Senatorial Committee. The Committee does not assert that the Resolution amounts to a modification of the Plan.[14] Rather, the Committee contends that "[t]o ignore the [State Central Committee]'s interpretation of the Plan would be tantamount to refusing to enforce a binding dispute resolution provision in a contract." ECF No. 39, at 16. The 20th House Committee's argument finds some support in Virginia law:

> It is well established that the construction of the organic agreement, by-laws, rules and regulations of a benefit society or other unincorporated voluntary association belongs, not to the court, but to the board, council or other tribunal provided for the purpose in the organization, if any. So long as the body upon which this power of interpretation has been conferred does not substitute legislation for interpretation, nor transgress the bounds of reason, common sense, or fairness, nor contravene

---

[14] Indeed, the Party has not amended the Plan to remove the "where permitted to do so language," despite passing other amendments on June 27, 2015, the same day as the Resolution, and three times thereafter. See The Plan, ECF No. 39-1, at 3. The 20th House Committee offers two reasons why the Party has not removed this language from the Plan. First, amending the Plan "would constitute a tacit admission by the [Party] that the Court in [24th Senatorial Committee] had properly interpreted the Plan, and therefore, that the [Party] had waived its constitutional rights, acquiesced to the Act, and incorporated the Act into the Plan." Albertson Decl., ECF No. 39-2, at 4. Second, "the amendment process is often very time consuming" and has not yet occurred. Id. The court finds these explanations less than compelling. But the issue in this case is not whether the Plan has been modified. Rather, the court must determine whether Virginia contract law requires the court to treat the Resolution as the binding interpretation of the Plan.

24

> public policy or the laws of the land, in their conclusions and
> decisions, the courts cannot interfere with them.

Bhd. of Locomotive Eng'rs v. Folkes, 201 Va. 49, 58, 109 S.E.2d 392, 398 (1959).[15] In

Folkes, three septuagenarian union members challenged a collective bargaining agreement

that set a mandatory retirement age at 70 years old for railroad workers. The union's by-laws

required its negotiator to act "in conjunction with the Advisory Board" before agreeing to a

compulsory retirement age. Folkes, 201 Va. at 52, 109 S.E.2d at 395. During the bargaining

process, the negotiator reported to the Advisory Board that the retirement age would be part

of the final agreement. But no officer on the Advisory Board affirmatively concurred or

approved the provision. The members challenging the mandatory retirement age alleged that

the negotiator failed to act "in conjunction with the Advisory Board," and thereby exceeded

the scope of his authority.

At trial, the negotiator stated with respect to his obligations to the Advisory Board,

"[s]ometimes there are discussions and other times there are no comments whatsoever

made, which has always been accepted as the Advisory Board's concurrence." Id. at 56, 109

S.E.2d at 397. The trial court disagreed and held that the negotiator was required "to obtain

the advice and active concurrence of the Board." Id. at 58, 109 S.E.2d at 398.

---

[15] See also Campbell v. Bhd. of Locomotive Firemen & Enginemen, 165 Va. 8, 12, 181 S.E. 444, 445
(1935) ("As mutual benefit societies, whether incorporated or not, are formed by the purely
voluntary association of individuals ... it is generally acknowledged that within their own field they
are as supreme in matters of discipline and internal policy ... and that the members of such
organizations can undoubtedly restrict themselves as to matters incidental to the operation of the
association to remedies before the tribunal created by it."); Trevett v. Prison Ass'n of Va., 98 Va.
332, 36 S.E. 373, 374 (1900) ("It is a voluntary association of individuals, who procured a charter for
certain specified objects. It is not controlled by the state, but by its own corporate officials. It makes
and enforces its own by-laws and regulations for the management of its affairs and property.").

On appeal, the Supreme Court of Appeals of Virginia noted that, pursuant to the by-laws, the negotiator "shall interpret the law of the [union] according to its plain and obvious meaning." Id. at 51, 109 S.E.2d at 394. In light of the authority vested to the negotiator, the state Supreme Court concluded that the trial judge impermissibly "substituted his own interpretation for the construction placed upon the organic laws, rules and regulations of the Brotherhood by the tribunal provided by that organization for such purpose." Id. at 58, 109 S.E.2d at 398. The court made clear that the "construction of a union's constitution and laws is for the union, through its appropriate board or officers; and the courts will accept such construction in the absence of fraud, illegality, or improper exercise of the power of construction." Id. at 58, 109 S.E.2d at 399. Accordingly, the Virginia Supreme Court held that the negotiator's view that he needed only the Advisory Board's tacit approval reflected "a permissible construction [of the by-laws], and we are of opinion that it should be given full effect under the circumstances here." Id. at 59–60, 109 S.E.2d at 399. The compulsory retirement age was affirmed.

Folkes dictates that, in applying Virginia law to this case, the court must defer to the Resolution if (1) the State Central Committee had final authority to interpret the Plan, and (2) the State Central Committee's interpretation did not "substitute legislation for interpretation, nor transgress the bounds of reason, common sense, or fairness, nor contravene public policy or the laws of the land." Id. at 58, 109 S.E.2d at 398.

Under this rubric, the 20th House Committee argues that Article X of the Plan vests the State Central Committee with final say-so in matters of interpreting the Plan. Article X Section C is titled "Finality" and states: "The State Central Committee shall make the final

26

decision, upon timely appeal, on all Party controversies and contests in any Election District of the State, rulings of the General Counsel and all other matters deemed to affect the efficiency of the Party organization or the success of the Party." The Plan, Art. X § C, ECF No. 39-1, at 26. The 20th House Committee argues that the appropriate focus is on the language "shall make the final decision ... [on] all other matters deemed to affect the efficiency of the Party organization or the success of the Party." According to the Committee, the language substituted by the ellipsis merely references Sections A and B of Article X, which govern rulings and contests within the Party, and does not limit the broad catch-all clause at the end of the Section.

Assuming, without deciding, that Article X § C provides the State Central Committee with final interpretative authority over the Plan, the Resolution fails the requirement that a valid interpretation must "not substitute legislation for interpretation, nor transgress the bounds of reason, common sense, or fairness, nor contravene public policy or the laws of the land." Folkes, 201 Va. at 58, 109 S.E.2d at 398.

In 24th Senatorial Committee, the Fourth Circuit held "that the language of the Plan is clear and unambiguous: the Plan delegates to the Committee the authority to determine the nomination method unless Virginia law otherwise limits that authority." 820 F.3d at 631. That holding is a legal conclusion that binds the court. See id. ("The interpretation of a written contract is a question of law that turns upon a reading of the document itself."). The Resolution directly contradicts the Fourth Circuit's holding, saying instead that the "the Act is not incorporated into the Party Plan." ECF No. 39-2, at 14. Faced with such a contradiction, the court must conclude that the Resolution amounts to an "improper

exercise of the power of construction" and does not warrant deference. <u>Folkes</u>, 201 Va. at 58, 109 S.E.2d at 399.

In short, by issuing the Resolution, the Party seeks to alter what the Fourth Circuit found to be the Plan's clear and unambiguous meaning. In <u>Folkes</u>' terms, the Resolution "substitute[s] legislation for interpretation" by contradicting the Fourth Circuit's determination as to the Plan's plain and unambiguous terms. <u>Id.</u> at 58, 109 S.E.2d at 398. Put another way, had the Plan provided that the "sky is blue," the Party could not pass a Resolution stating that "blue does not mean blue, it means orange." Rather than interpret the Plan, the Resolution seeks to contradict what the Fourth Circuit found the Plan's plain meaning to be. The contradiction posed by the Resolution is in the nature of legislation, not interpretation. As such, it runs afoul of <u>Folkes</u>. Moreover, the Resolution transgresses the "laws of the land," <u>id.</u>, in that it directly contradicts a legal conclusion arrived at by binding authority. The Party cannot escape the Fourth Circuit's binding interpretation of the Plan's plain language by simply issuing a statement of disagreement. Given the Fourth Circuit's holding that the "where permitted to do so" language is clear and unambiguous, the only way in which a General Assembly committee could demonstrate causation is to persuade the Party to amend the Plan. This the Party has not done. As such, the provision on which the Fourth Circuit has spoken remains unaltered. The Resolution does not constitute a valid interpretation of the Plan in accordance with Virginia law.

Article V § D(1) of the Plan incorporates the Act by qualifying the 20th House Committee's power to select a nomination method "where [it is] permitted to do so under Virginia Law." And, therefore, the court must conclude that "the Party has made a

voluntary choice to limit the [20th House] Committee's authority ... [and thus,] the source of the complaint is the party's own decision." 24th Senatorial Committee, 820 F.3d at 632–33. The 20th House Committee fails to show causation and will be dismissed from the case.

In contrast, the Plan allows the 6th Congressional Committee to select its nominee by convention, party canvass or primary without reference to Virginia law. See The Plan, Art. IV § D(1). The 6th Congressional Committee's injury is not "caused by a voluntary choice made by the Virginia Republican Party." Marshall, 105 F.3d at 906. Rather, the Act is the sole cause of its injury. And invalidating the Act would leave in place Virginia Code § 24.2-509(A), which allows political parties to select their preferred method of nomination. The 6th Congressional Committee demonstrates causation and redressability, in addition to the requisite injury for standing purposes.

3. *Ripeness and Mootness of the 6th Congressional Committee's Challenge.*

Defendants frame the bulk of their justiciability arguments in terms of standing. But their contentions that plaintiffs lack injury also raise the issue of ripeness, which the court addresses on its own. Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc., 501 U.S. 252, 265 n.13 (1991) (Ripeness "concerns our jurisdiction under Article III, so we must consider the question on our own initiative."). "To determine whether the case is ripe, [courts] balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." Miller I, 462 F.3d at 319.

For the same reasons the 6th Congressional Committee demonstrates injury for standing purposes, the court concludes that the case is fit for resolution. See id. ("Analyzing ripeness is similar to determining whether a party has standing."). In Metropolitan

Washington Airports Authority, the Supreme Court was faced with a challenge to a congressional board's veto power over a regional airport authority's operation of airports near the District of Columbia. 501 U.S. at 252. Prior to the suit, the board had not exercised that veto power. Nevertheless, the Supreme Court had "no trouble concluding ... that a challenge to the Board of Review's veto power is ripe even if the veto power has not been exercised to respondents' detriment." Metro. Wash. Airports Auth., 501 U.S. at 265 n.13. The Court recognized that the threat of the veto hung over the airport authority "like the sword over Damocles, creating a 'here-and-now subservience' to the Board of Review sufficient to raise constitutional questions." Id. (quoting Bowsher v. Synar, 478 U.S. 714, 727 n.5 (1986)).

The Supreme Court has indicated that these principles apply with particular force to cases involving election laws: "Challengers to election procedures often have been left without a remedy in regard to the most immediate election because the election is too far underway or actually consummated prior to judgment." Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 301 n.12 (1979). "Justiciability in such cases depends not so much on the fact of past injury but on the prospect of its occurrence in an impending or future election." Babbitt, 442 U.S. at 301 n.12.

Although today's enforcement of the Act is not the cause of the 6th Congressional Committee's injuries, the threat of its enforcement is ever-present. Therefore, the dispute is fit for resolution. As for the hardship prong of the ripeness analysis, withholding a decision until a conflict between an incumbent and a committee fully develops would only burden the parties. Striking down the Act "on the eve of [an] election would seriously disrupt the

30

election process" that the Board and the Department administer. Miller I, 462 F.3d at 321;

see also Purcell v. Gonzalez, 549 U.S. 1, 4–5 (2006) ("Court orders affecting elections … can

themselves result in voter confusion and consequent incentive to remain away from the

polls."). Moreover, "[b]y obtaining a final decision now, the plaintiffs will have adequate time

to make effective campaign decisions." Miller I, 462 F.3d at 321. The case is therefore ripe.

The court must also raise the issue of whether the 6th Congressional Committee's

claims are moot given Representative Goodlatte's recent announcement of his retirement.

Friedman's, Inc. v. Dunlap, 290 F.3d 191, 197 (4th Cir. 2002) ("The parties did not raise the

issue of mootness, but the question of whether we are presented with a live case or

controversy is a question we may raise sua sponte.").[16] While standing is assessed at the time

the complaint is filed, mootness requires that the requisite injury to the plaintiff continue

throughout the life of the case. U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 396 (1980).

After the court heard argument on the cross-motions for summary judgment,

Representative Goodlatte announced his plan to retire from Congress at the end of the

current term. See Press Release, Rep. Goodlatte, It's An Honor to Serve You (Nov. 9, 2017),

https://goodlatte.house.gov/news/documentsingle.aspx?DocumentID=1038. Because no

incumbent is running for reelection, the Act will not limit the 6th Congressional

Committee's authority to choose a nomination method in the 2018 election cycle. Although

there will be no incumbent running in the 6th congressional district in 2018, the 2020

election is right around the corner, raising the same constitutional concerns. As such, this

---

[16] The defendants suggested in a post-hearing supplemental filing that the 6th Congressional
Committee's claims are not justiciable in light of Representative Goodlatte's retirement. See ECF
No. 53, at 1 n.1. Because the parties have not briefed the mootness issue, the court examines the
matter on its own.

case, like others challenging election laws, falls "comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." Davis, 554 U.S. at 735 (quoting Fed. Election Comm'n v. Wisconsin Right To Life, Inc., 551 U.S. 449, 462 (2007)); see also Storer v. Brown, 415 U.S. 724, 737 n.8 (1974) ("The 'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks."). "That exception applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." Davis, 554 U.S. at 735.

The period between the filing of the complaint on February 24, 2017, and Representative Goodlatte's retirement announcement on November 9, 2017, was unquestionably too short a time to litigate this case. In fact, the parties agreed during a scheduling conference to set a trial date in January 2018 in order to avoid burdening the Department and Board with trial preparation during the November 2017 elections. As the Fourth Circuit noted in Miller I, judicial decisions regarding the methods of nominating candidates for political office necessarily must be made with sufficient lead time "[b]ecause campaign planning decisions have to be made months, or even years, in advance of the election to be effective." 462 F.3d at 317-18. It simply makes no sense to dismiss this case in early 2018 on ripeness or mootness grounds because there happens to be no incumbent in

the 6th congressional district for this year's election, only to have that circumstance reversed ten months from now when the 2020 election cycle begins. [17]

Indeed, in Miller I, the Fourth Circuit reversed the district court's dismissal, on justiciability grounds, of a suit brought in 2005 over the constitutionality of Virginia's open primary statute applicable to the 2007 election cycle. In an opinion entered on October 11, 2005, the district court concluded that the alleged injury facing the senatorial committee was neither actual nor imminent and that the issue was not ripe for adjudication because of the "host of eventualities that could change the political landscape between now and 2007." Miller v. Brown, 394 F. Supp. 2d 794, 802 (E.D. Va. 2005). On appeal, the Fourth Circuit disagreed, finding the case "fit for judicial review. The only issue in the case is whether Virginia's open primary law violations the plaintiff's First Amendment rights to freely associate, which presents a purely legal question." 462 F.3d at 319. The same is true as regards the Incumbent Protection Act at issue in this case.

As for the second prong of the exception, the 6th Congressional Committee has shown that it can reasonably expect that a future incumbent will invoke the Act in light of incumbents' repeated history of doing so. See 2016 6th Congressional Committee SBE-516 Form, ECF No. 39-26; 2015 State Senate SBE-509 Forms, ECF No. 39-28; 2013 House of Delegates SBE-509 Forms, ECF No. 39-29; 2016 Rep. Goodlatte SBE-509 Form, ECF No. 39-24. "The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges,

---

[17] The timing of the impact of the decision in this case upon elections in Virginia is further compressed by the inevitable appeal of this case.

thus increasing the likelihood that timely filed cases can be adjudicated before" an incumbent invokes the Act in the future. Storer, 415 U.S. at 737 n.8.

The 6th Congressional Committee has demonstrated standing, and the court finds that its claims are not barred by the ripeness or mootness doctrines. Therefore, the 6th Congressional Committee's claim is justiciable and the court will address its merits below.

### B. Standing of the Individual-Plaintiffs

The individual-plaintiffs, Fitzgerald, Kwiatkowski, and Yensho, challenge the Act as registered voters and members of the Party. Defendants argue that the individual-plaintiffs lack standing because they cannot show "an invasion of a legally protected interest." Lujan, 504 U.S. at 560. Defendants contend that the individual-plaintiffs have no authority under the Plan or state law to select their party's means of nomination, and, therefore, the Act does not regulate any protected right belonging to the individual-plaintiffs. In response, the individual-plaintiffs claim to "have suffered a legally cognizable injury merely by virtue of their membership in the [Party]." ECF No. 44, at 9.

The individual-plaintiffs rely on the proposition that "[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents." Democratic Party of U. S. v. Wis. ex rel. La Follette, 450 U.S. 107, 122 (1981) (quoting Sweezy v. N.H. by Wyman, 354 U.S. 234, 250 (1957)). As plaintiffs recognize, however, the issues in La Follette and Sweezy did not involve the standing doctrine, much less individual party members' standing to challenge a state law regulating party nomination processes. In contrast, the Fourth Circuit spoke directly on this topic in 24th Senatorial Committee. There, Daniel Moxley challenged the Act as a prospective candidate against an incumbent state

senator and as member of the Party. He brought a claim under the Equal Protection Clause of the Fourteenth Amendment.

The Fourth Circuit began its analysis of Moxley's claim by observing that "[u]nder Virginia law, there are two entities that have the right to determine the nomination method: political parties and incumbents." 24th Senatorial Committee, 820 F.3d at 633. The court also noted that the "Plan does not authorize individual party officials or members to determine the nomination method for legislative districts." Id. "Because neither Virginia law nor the Plan gives Moxley 'a legally protected interest' in determining the nomination method in the first place, he fails to make out 'an *invasion* of a legally protected interest,' i.e. actual injury, in this case." Id. (quoting Lujan, 504 U.S. at 560). The same conclusions apply to the individual-plaintiffs in this case: none have a legally protected interest in determining a nomination method. Accordingly, the court will dismiss Fitzgerald, Kwiatkowski, and Yensho, in their capacities as registered voters and members of the Party, for lack of standing.[18]

### C. Standing of the Committee Chairmen

Defendants also challenge Fitzgerald's and Yensho's standing to sue as chairmen of their respective committees. Fitzgerald is chairman of the 20th House Committee, a plaintiff in this suit. Yensho is chairman of the Greene County Committee, which is not a party to

---

[18] In addition to a First Amendment claim, the individual-plaintiffs assert a claim under the Equal Protection Clause. See Compl., ECF No. 1, at ¶ 49. Plaintiffs' briefs on summary judgment are silent on the Equal Protection claim. In any event, 24th Senatorial Committee bars all claims the individual-plaintiffs bring because they have no authority under the Act or the Plan to select a nomination method, and thus, they have no legally protected interest affected by the Act.

this case. They contend to have a personal stake in the outcome of this case sufficient to satisfy the standing doctrine.[19]

The chairman-plaintiffs argue that they have a legally protected interest arising out of the manner in which the Act is enforced. Virginia law imposes certain affirmative obligations on committee chairmen to communicate with the Board about nomination methods. First, Virginia Code § 24.2-516 states that "[e]ach chairman shall file timely written notice with the

---

[19] Fitzgerald would have standing to sue in her representative capacity of the 20th House Committee if that committee had demonstrated causation and redressability. In both Miller I and 24th Senatorial Committee, the chairmen of Party committees joined their committees as plaintiffs to challenge Virginia election laws. See Miller I, 462 F.3d at 314; 24th Senatorial Committee, 820 F.3d at 626. At no point, however, did the Fourth Circuit or the district courts question the chairmen's standing. Indeed, the chairmen's claims rose and fell with their committees' claims—in 24th Senatorial Committee, the court even used the shorthand "the 'Committee'" to collectively refer to the 24th Senatorial Committee and its chairman Kenneth Adams, 820 F.3d at 626—so the issue of the chairmen's standing was of no consequence. The courts' silence suggests that the committee chairmen in Miller I and 24th Senatorial Committee sued in a representative capacity to further the interests of their committees.

"The capacity to sue or be sued refers to the qualification of a party to litigate in court and is determined under Rule 17." Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1292 (3d ed.). Under Rule 17(b)(3), the court must look to Virginia law to determine the capacity of an individual acting in as a representative of an unincorporated association. In Virginia, "unincorporated associations or orders may sue and be sued under the name by which they are commonly known and called." Va. Code Ann. § 8.01-15. The Virginia Supreme Court has interpreted this statute as "contemplat[ing] that litigation brought pursuant thereto will be instituted by the officers of such unincorporated association or order who have charge of its affairs or by members of the association or order who have been legally authorized to proceed with the litigation." Brown v. Va. Advent Christian Conference, 194 Va. 909, 912–13, 76 S.E.2d 240, 242 (1953); see also Int'l Fed'n of Prof'l & Tech. Eng'rs v. United States, 111 Fed. Cl. 175, 181 (2013) (examining Brown and collecting cases). In other words, a corollary to Virginia Code § 8.01-15 is that individuals may sue on behalf of an unincorporated association if they have the association's blessing to pursue the case.

Fitzgerald has that blessing, but Yensho does not. See 20th House Committee Dep., ECF No. 39-4, at 11:14-18; Greene County Committee Meeting Minutes, Feb. 20, 2017, ECF No. 39-31, at 104 (During his chairman's report, Yensho "said that his purpose in relating this information was to assure our members that [Greene County Committee] would not be obligated in any way by his participation in this case."); see also Yensho Dep., ECF No. 39-31, at 10:20-24. Therefore, Fitzgerald may proceed with her challenge to the Act as an authorized representative of the 20th House Committee. See Miller I, 462 F.3d at 314; 24th Senatorial Committee, 820 F.3d at 626. But her claims in this capacity must fail for the same reasons the 20th House Committee lacks standing. Yensho does not purport to sue in a representative capacity, and thus, can only pursue his claim if he has a sufficient personal interest in the outcome of this case.

Board whether or not a primary has been adopted and identify each office for which a primary has been adopted." Second, if a primary is to be held, Virginia Code § 24.2-527(A) requires committee chairmen to "to furnish the name of any candidate for nomination" to the Board and appropriate general registrar. In furnishing the list of candidates running for the party's nomination, the chairman must "certify that a review of the filed candidate petitions found the required minimum number of signatures of qualified voters for that office to have been met." Va. Code Ann. § 24.2-527(A). The chairman-plaintiffs argue that "not only does the Act empower incumbents to influence or dictate the method of nomination, it compels a party chairman to be active participants in a primary, if one is forced on the [sic] his or her committee." ECF No. 44, at 8.

According to the chairman-plaintiffs, their refusal to comply with their obligations under Virginia Code §§ 24.2-516 and 24.2-527 could expose them to criminal prosecution under Virginia Code § 24.2-1001. That section provides that "[i]f any officer of election, member of an electoral board, or other person on whom any duty is enjoined by law relative to any election, is guilty of willful neglect of his duty, he shall be guilty of a Class 1 misdemeanor." Va. Code Ann. § 24.2-1001. The chairman-plaintiffs contend that refusal to notify the Board of the method their committee adopted for nomination, Va. Code Ann. § 24.2-516, or certify candidates for a primary, Va. Code Ann. § 24.2-527, could amount to "willful neglect," and thus, underlie a criminal prosecution pursuant to Virginia Code § 24.2-1001.

The chairman-plaintiffs' asserted injury is insufficient to satisfy standing. They have not identified a single prosecution, or threat of prosecution, pursuant to Virginia Code §

24.2-1001 for any conduct, much less a prosecution against a committee chairman for protesting the enforcement of the Act. Moreover, the chairman-plaintiffs' alleged injury could manifest only if a fully developed conflict between their committee and incumbent occurred and the chairmen decided to fight back by shirking their responsibilities under Virginia Code §§ 24.2-516 and 24.2-527. Those hypothetical events are not presented in this case. The chairman-plaintiffs' alleged personal injury is not "real and immediate," but rather "conjectural" and "hypothetical." O'Shea, 414 U.S. at 494; see also Los Angeles v. Lyons, 461 U.S. 95, 111 (1983) ("The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again."). As such, the chairman-plaintiffs have no personal stake in the outcome of this case and must be dismissed.

To summarize the court's justiciability determinations: the 6th Congressional Committee demonstrates that its claim presents a "Case" or "Controversy" as required by Article III of the Constitution. The 20th House Committee, however, fails to satisfy the causation requirement of standing. Fitzgerald, Yensho, and Kwiatkowski cannot pursue their claims as individual voters or members of the Party. And Fitzgerald and Yensho must be dismissed for lack standing to sue in their capacities as committee chairmen. The court now turns to the merits of the 6th Congressional Committee's claim.

## IV.

The 6th Congressional Committee contends that the Act, Va. Code Ann. § 24.2-509(B), is facially invalid because it violates its rights under the First Amendment. "A political party has a First Amendment right to limit its membership as it wishes, and to

38

choose a candidate-selection process that will in its view produce the nominee who best represents its political platform." N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 202 (2008). Nevertheless, the Constitution does not grant political parties free reign in determining their nomination processes. See id. at 203. The Elections Clause grants states power to set the "Times, Places and Manner of holding Elections." U.S. Const. art. I, § 4, cl. 1. As such, the Supreme Court recognizes that states "have a major role to play in structuring and monitoring the election process, including primaries." Cal. Democratic Party v. Jones, 530 U.S. 567, 572 (2000). But the "power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the freedom of political association." Tashjian v. Republican Party of Conn., 479 U.S. 208, 217 (1986).

Given the tension between political parties' rights to free association and states' roles in regulating elections, "the rigorousness of [the court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." Burdick v. Takushi, 504 U.S. 428, 434 (1992). This test, often referred to as the Anderson-Burdick balancing test, requires the court to weigh the "the character and magnitude of the [plaintiffs'] asserted injury" against "the precise interests put forward by the State as justifications for the burden." Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). "Regulations that impose a severe burden on association rights are subject to strict scrutiny, and a court applying this level of review may uphold the regulation only if it is 'narrowly tailored and advances a compelling state interest.' However, if a statute imposes only modest burdens, then 'a State's important regulatory interests will usually be

39

enough to justify reasonable, nondiscriminatory restrictions.'" S.C. Green Party v. S.C. State

Election Comm'n, 612 F.3d 752, 756 (4th Cir. 2010) (quoting Anderson and Burdick).

## A.

The court must first assess the "character and magnitude" of the 6th Congressional

Committee's injury. As previewed in the standing analysis above, the Constitution protects

"the ability of citizens to band together in promoting among the electorate candidates who

espouse their political views." Jones, 530 U.S. at 574. "Freedom of association means not

only that an individual voter has the right to associate with the political party of her choice,

but also that a political party has a right to identify the people who constitute the association,

and to select a standard bearer who best represents the party's ideologies and preferences."

Eu v. S.F. Cty. Democratic Cent. Comm., 489 U.S. 214, 224 (1989). In applying these

principles, the Supreme Court has struck down state statutes that required blanket primaries,

see Jones, 530 U.S. 567,[20] and closed primaries, see Tashjian, 479 U.S. 208, but has upheld a

statute that mandated semi-closed primaries, see Clingman v. Beaver, 544 U.S. 581 (2005).[21]

No binding authority, however, has examined the burden associated with a statute like the

one at issue here.

Indeed, Virginia's Incumbent Protection Act is unique among the states; the court

has not found, and the parties have not identified, any other state that gives incumbents the

statutory power to select a nomination method over their party's objection. In Miller III,

---

[20] A "blanket" primary places all candidates on the same ballot, allowing voters to vote for one
party's nominee for one office and another party's nominee for another office. Jones, 530 U.S. at
570.
[21] A "semi-closed" primary allows a party's members and independent voters to participate in the
party's primary. Clingman, 544 U.S. at 584.

however, Judge Wilkinson provided relevant guidance in a dissent from a denial of a petition for rehearing en banc in which he outlined the many reasons he viewed Virginia's Incumbent Protection Act as "obviously unconstitutional." 512 F.3d at 105. As mentioned, the Miller saga primarily involved Virginia's open primary law, Va. Code Ann. § 24.2-530. In the 2007 election cycle, the 11th Senatorial District Republican Committee was required to hold a primary to select its nominee because Senator Stephen Martin, the Committee's incumbent, selected a primary pursuant to Virginia Code § 24.2-509(B). The 11th Senatorial Committee sought to limit primary voters to individuals who pledged to support the Republican nominee in the general election. The Virginia Board of Elections refused to comply with the pledge requirement because of Virginia's open primary law. So the Committee challenged the open primary law as facially invalid, but brought no such challenge against the Incumbent Protection Act.

Once the standing and ripeness issues were resolved, see Miller I, 462 F.3d 312, the district court invalidated the open primary law but only "as applied to the narrow facts of this case"—that is, where a General Assembly incumbent forces his committee to hold a primary, and the committee seeks to limit participation in that primary. Miller v. Brown, 465 F. Supp. 2d 584, 595 (E.D. Va. 2006), aff'd, 503 F.3d 360 (4th Cir. 2007). The district court held that "the regulatory effect of § 24.2–530, operating in tandem with § 24.2–509," forced the 11th Senatorial Committee to associate with voters from other parties, and could not survive strict scrutiny. Miller, 465 F. Supp. 2d at 594. The Fourth Circuit in Miller II affirmed those holdings for substantially the same reasons articulated by the district court and required the Board to implement the pledge requirement.

Both sides filed for en banc review, which the Fourth Circuit denied without explanation. See Miller III, 512 F.3d at 99. Judge Wilkinson dissented from that denial, arguing that the panel's award of as-applied relief was insufficient. He would have gone further and struck down the Incumbent Protection Act as facially unconstitutional. Judge Wilkinson noted that incumbents and political parties "face very different incentives with regard to the selection of nominating procedures." Id. at 104. And he explained that the "incumbent will focus primarily on his or her chances for re-election, while the party may have multi-faceted goals that are not necessarily best achieved by maximizing a particular individual's re-electability." Id. at 105. "Allowing the incumbent to bind a party despite these differences—without the party's explicit or implicit consent—is the very definition of an unconstitutional burden on the party's associative rights, and a sufficient reason, in and of itself, to declare Va. Code Ann. § 24.2-509(B) unconstitutional." Id.

Judge Wilkinson's conclusions about the Act's harsh effects on political parties are supported by the record in this case. The 6th Congressional Committee has shown that each of the various nomination methods distinctly affects campaign planning and messaging and can alter the identity of prospective candidates. As mentioned, Virginia funds and conducts primaries and the Party funds and conducts other nomination methods. See Va. Code Ann. §§ 24.2-517, 24.2-510. In primaries, Virginia Code § 24.2-530 mandates that all registered voters are invited to participate. In non-primary processes, the Party limits participation to Party members. See The Plan, Art. I § A.[22] The Plan recognizes three nomination methods

---

[22] Article 1 § A of the Plan sets forth the qualifications of Party members. Specifically, voters are qualified if (a) they have not voted in another party's nomination process in the last five years, The Plan, Art. I § A(4); (b) they are "in accord with the principles of the Republican Party," The Plan,

42

other than primaries: a party canvass, a convention, and a mass meeting. See id. A party

canvass resembles a primary but is party-run and closed to non-members. Jenkins Decl.,

ECF No. 39-27, at 8; see also App. A to the Plan, Model Calls for Mass Meetings, Party

Canvasses and Conventions, ECF No. 39-1, at 27-37. Conventions and mass meetings occur

at a single location and are similar to legislative assemblies governed by parliamentary

procedures. Id. Conventions require Party members to elect delegates to participate in the

nomination process, whereas mass meetings do not involve representative delegates. Id.

Professor Jenkins, plaintiffs' expert witness, notes that a primary would typically

"allow for the largest pool of potential voters," especially in light of Virginia's open primary

law. Jenkins Decl., ECF No. 39-27, at 8. Therefore, "the distribution of voters will be less

skewed ideologically, and the median voter will (all else equal) be more moderate." Id. He

adds that the "other three party-based methods of nomination would generate much smaller

pools of potential voters" because the Party limits participation to its members. Id.

Moreover, party-run methods can be "more exotic (from an average voter's perspective) …

[and thus,] lend themselves more toward 'committed partisans'—those who are better

informed and more politically motivated." Id. at 8–9. Jenkins concludes that "[i]ncumbents

in Virginia thus have the ability to assess how they would perform under the different

nomination methods and choose the one that they believe maximizes their chances of

reelection." Id. at 9.

---

Art. I § A(1); and (c) if requested, they express "their intent to support all of its nominees for public
office in the ensuing election," id. Any member who "publicly supports a candidate in opposition to
a Republican nominee" is excluded from party actions for four years. The Plan, Art. I § A(2). Party
officials can waive certain of these requirements, but generally, only those qualified "as members of
the Republican Party of Virginia [may participate] in its mass meetings, party canvasses, conventions,
or primaries encompassing their respective electoral district." The Plan, Art. I § A(1).

Just as incumbents calculate the pros and cons of certain nomination processes, so do the political parties. The means by which the 6th Congressional Committee selects its nominee thus alters how the Committee prepares for a given election cycle, including messaging, fundraising, and recruiting candidates.

The 6th Congressional Committee argues that these burdens fall into two doctrinal buckets. First, the Act gives rise to "forced association [that] has the likely outcome ... of changing the parties' message." Jones, 530 U.S. at 581–82. Because party-based methods are limited to Party members and primaries are open to the voting public, an incumbent's selection of a primary pursuant to the Act forces the committee "to associate with those who do not share their beliefs." Id. at 586. Second, the Act impermissibly interferes with the Party's internal party governance. See id. at 573 ("[W]e have continually stressed that when States regulate parties' internal processes they must act within limits imposed by the Constitution."); see also Tashjian, 479 U.S. at 224 (A State regulation may not "prevent the [political] parties from taking internal steps affecting their own process for the selection of candidates.").

In response, defendants argue that the Act cannot force the 6th Congressional Committee to associate with members of other political parties because, under Miller II, the 6th Congressional Committee can lawfully demand that the Board implement a pledge requirement among the Party's primary voters. In short, defendants claim that the as-applied relief awarded in Miller II solves any concerns of forced association. The court need not resolve the severity of the Act's burden on the 6th Congressional Committee's protections

44

against forced association, however, because the burden on the Committee's internal party governance is plainly severe and sufficient to trigger strict scrutiny.

In Eu v. San Francisco County Democratic Central Committee, the Supreme Court examined a series of California laws that regulated the internal governance of the State's political parties. 489 U.S. 214. The state laws banned parties from endorsing primary candidates, "dictate[d] the size and composition of the state central committees; ... specif[ied] the time and place of committee meetings; and limit[ed] the dues parties may impose on members," among other regulations. Eu, 489 U.S. at 217–19. In considering the validity of these regulations, the Supreme Court noted that "a State cannot substitute its judgment for that of the party as to the desirability of a particular internal party structure, any more than it can tell a party that its proposed communication to party members is unwise." Id. at 232–33. And most relevant here, the Court reiterated that states cannot "prevent the parties from taking internal steps affecting their own process for the selection of candidates." Id. at 227 (quoting Tashjian, 479 U.S. at 224). The Court applied strict scrutiny and invalidated the state laws.

In this case, the Party's Plan instructs that the 6th Congressional Committee "shall determine" the means by which the Republican candidate is nominated in its district. The Plan, Art. IV § D(1). The Act, however, prevents the 6th Congressional Committee from making that determination freely. If the 6th Congressional Committee wants to use a party canvass or a convention, the Committee must obtain the consent of its primary-nominated incumbent. See Va. Code Ann. § 24.2-509(B). The Act allows the incumbent to prevent the 6th Congressional Committee from conducting its own party canvass or convention,

45

following its own procedures, and funding its own nominating process whenever the incumbent sees fit. As a result, the Act introduces significant uncertainty into the 6th Congressional Committee's campaign planning process. That uncertainty requires the 6th Congressional Committee to prepare for an election cycle as if its preferred party-run nomination method will govern (in the event the incumbent consents) or a primary will occur (in the event the incumbent vetoes the Committee's preferred method). In other words, an incumbent's power to veto the Committee's choice of candidate selection process hangs over the 6th Congressional Committee "like the sword over Damocles," Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc., 501 U.S. 252, 265 n.13 (1991), and affects how the Committee prepares for elections, shapes its message, and recruits candidates. Because the Act "prevent[s] the parties from taking internal steps affecting their own process for the selection of candidates," it inflicts a severe burden on the 6th Congressional Committee's associational rights. Eu, 489 U.S. at 227.[23]

---

[23] The parties briefed the 6th Congressional Committee's as-applied challenge to the Act, which it asserts as an alternative to its facial challenge. The as-applied challenge regards the Department's enforcement of the Act, which the Department undertakes in part by promulgating two forms: (1) Form SBE-509 (also titled ELECT-509 in some years), which incumbents use to notify both the Department and their respective party committee what nomination method they have selected; and (2) Form SBE-516 (also titled ELECT-516 in some years), which committee chairmen use to notify the Department whether a primary or non-primary method has been adopted. Cortes Dep., ECF No. 39-7, at 34:11–35:12; see also Letter from Matthew J. Abell, Senior Elections Administrator, Virginia Department of Elections, to political party chairs, ECF No. 39-9; Email from Abell to state senators, ECF No. 39-10. The Department has used various iterations of these forms over recent years. See 2015 SBE-509(4), ECF No. 39-12; 2015 SBE-516(4), ECF No. 39-13; 2016 SBE-509, ECF No. 39-15; 2016 SBE-516, ECF No. 39-16; 2017 ELECT-509, ECF No. 39-21; 2017 ELECT-516, ECF No. 39-22. In 2016 and 2017, the Department issued revised forms that treated all incumbents identically, indicating that even non-General Assembly incumbents have the unilateral power to choose a method of nomination. See id. If the court were to find that the Act does not violate the 6th Congressional Committee's rights, but it does violate the rights of General Assembly committees, plaintiffs argue that the court ought to enjoin the Department from enforcing the Act in a manner inconsistent with its strict text. However, the court need not address this as-applied

The court recognizes that the 6th Congressional Committee does not have a constitutional right to select a nomination method of its choosing. See Clingman, 544 U.S. 581 (upholding statute that mandated use of semi-closed primaries). But the Act does not limit the type of nomination methods the 6th Congressional Committee may use; it simply provides incumbents with the power to force a particular method over the objection of their party. Providing incumbents with a statutory right to dictate political parties' internal affairs, especially in the realm of selecting candidates, imposes a severe burden on the parties' associational rights that triggers strict scrutiny.

## B.

In light of the severity of its burden, the Act can survive constitutional scrutiny only if it is "narrowly tailored to advance a compelling state interest." Burdick, 504 U.S. at 433. The Constitution permits states to "enact laws that interfere with a party's internal affairs when necessary to ensure that elections are fair and honest." Eu, 489 U.S. at 231. Defendants argue that the Act advances two specific interests that promote fair elections.

First, defendants rely on dictum from a Supreme Court decision that "[w]e have considered it too plain for argument, for example, that a State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion." Jones, 530 U.S. at 572; cf. N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. 196, 203 (2008) ("We have, for example, considered it to be 'too plain for argument' that a State may prescribe party use of primaries or conventions to select nominees who appear on the general-election ballot."); Am. Party of Tex. v. White, 415 U.S.

---

challenge because the Act, as written, severely burdens the associational rights of the 6th Congressional Committee.

767, 781 (1974) ("It is too plain for argument, and it is not contested here, that the State may limit each political party to one candidate for each office on the ballot and may insist that intraparty competition be settled before the general election by primary election or by party convention."). Defendants suggest that the Act merely resolves intraparty disputes over nomination methods by giving the incumbent the unilateral ability to invoke a primary. But this contention is foreclosed by Miller II, in which the Fourth Circuit exhaustively explained that "at least for purposes of selecting a nomination method, Virginia does not view the incumbent legislator as a representative of the party." 503 F.3d at 369. So a conflict between an incumbent and a committee does not reflect an "intraparty" dispute, but rather, a dispute between an individual, who may well be "acting in his individual interest," id., and a political party that has associational protections under the First Amendment. In addition, the Act does not resolve disputes in a "democratic fashion." Unlike the hypothetical primary mentioned in Jones, the Act does not require a primary. Rather, the Act allows an individual incumbent to select a method of nomination over his party's objection—a process that can hardly be characterized as "democratic."

Second, defendants rely on other Supreme Court dicta permitting "States to set their faces against 'party bosses' by requiring party-candidate selection through processes more favorable to insurgents, such as primaries." Lopez Torres, 552 U.S. at 205. It is absurd to suggest that the Incumbent Protection Act is "favorable to insurgents." Further, the Act does not mandate a particular type of nomination method, which Virginia may well do within the bounds of the Constitution. Rather, the Act allows incumbents to strip the 6th Congressional Committee of its ability to select from a menu of nomination methods, a

48

menu that is available under the Plan and Virginia law except when an incumbent invokes the Act to eliminate all but the primary entrée. The Supreme Court's decision in Lopez Torres, which upheld New York's selection of its Supreme Court justices by convention, is of no aid to defendants.

At bottom, the Act provides express statutory benefits to incumbents at the expense of political parties' associational rights. Defendants have not shown any state interest that justifies such an intrusion into the 6th Congressional Committee's constitutional protections. Virginia law allows political parties to conduct a variety of nomination methods, and the Constitution does not permit a state to grant incumbents power to take away that authority to further their individual interests. The Act fails constitutional muster.

## V.

The court must now decide the scope of the remedy. The 6th Congressional Committee requests an injunction that prohibits the Board and the Department from enforcing the entirety of Virginia Code § 24.2-509(B). The proposed remedy raises two related issues: whether the provisions of the Act that apply to the 6th Congressional Committee are severable from the provisions that apply to General Assembly committees, and whether facial relief, rather than as-applied relief, is appropriate

"Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem." Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 328 (2006). For example, courts prefer "to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." Ayotte, 546 U.S. at 328–29. With regard to

49

severability, the Supreme Court directs that in a fashioning remedy, the court must "retain those portions of the Act that are (1) constitutionally valid, (2) capable of functioning independently, and (3) consistent with [the legislature's] basic objectives in enacting the statute." United States v. Booker, 543 U.S. 220, 258–59 (2005). Each of the three requirements must be met for a statute to be severable. See Ameur v. Gates, 759 F.3d 317, 325 (4th Cir. 2014) (characterizing Booker as a test with three elements: "First, we must strike any provisions that are not themselves constitutionally valid …").

In this case, only the fourth sentence of the challenged statute directly applies to the 6th Congressional Committee.[24] Excising the fourth sentence and leaving the rest of the Act

---

[24] For ease of reference, Virginia Code § 24.2-509 is reprinted here with the addition of numbers for each sentence in Subsection B:

    A. The duly constituted authorities of the state political party shall have the right to determine the method by which a party nomination for a member of the United States Senate or for any statewide office shall be made. The duly constituted authorities of the political party for the district, county, city, or town in which any other office is to be filled shall have the right to determine the method by which a party nomination for that office shall be made.

    B. [1] Notwithstanding subsection A, the following provisions shall apply to the determination of the method of making party nominations. [2] A party shall nominate its candidate for election for a General Assembly district where there is only one incumbent of that party for the district by the method designated by that incumbent, or absent any designation by him by the method of nomination determined by the party. [3] A party shall nominate its candidates for election for a General Assembly district where there is more than one incumbent of that party for the district by a primary unless all the incumbents consent to a different method of nomination. [4] A party, whose candidate at the immediately preceding election for a particular office other than the General Assembly (i) was nominated by a primary or filed for a primary but was not opposed and (ii) was elected at the general election, shall nominate a candidate for the next election for that office by a primary unless all incumbents of that party for that office consent to a different method.

intact would accord with "the presumption of severability." Ameur, 759 F.3d at 325. But the presumption of severability is defeated if the Act does not satisfy Booker's three-part test. Under Booker, the court must first determine whether provisions other than the fourth sentence of the Act are "constitutionally valid." 543 U.S. at 258. The issue is whether the constitutional challenge by the 6th Congressional Committee extends to the provisions of the Act applicable to General Assembly committees (i.e., the second and third sentences). This inquiry raises yet another thorny issue involving standing.

Typically, a "litigant has standing to challenge the constitutionality of a statute only insofar as it adversely affects his own rights." Clements v. Fashing, 457 U.S. 957, 966 n.3 (1982) (plurality opinion). For example, in Printz v. United States, 521 U.S. 898 (1997), the Supreme Court invalidated certain provisions of a federal statute regulating firearms that required local law enforcement to perform background checks on gun purchasers. But the Printz court refused to consider provisions of the statute that required firearm dealers to comply with background check procedures. No plaintiff was a firearm dealer, so the Court "decline[d] to speculate regarding the rights and obligations of parties not before [it]." Printz, 521 U.S. at 935.

The Supreme Court, however, has "altered its traditional rules of standing to permit—in the First Amendment area—attacks on overly broad statutes." Broadrick v.

---

[5] When, under any of the foregoing provisions, no incumbents offer as candidates for reelection to the same office, the method of nomination shall be determined by the political party.

[6] For the purposes of this subsection, any officeholder who offers for reelection to the same office shall be deemed an incumbent notwithstanding that the district which he represents differs in part from that for which he offers for election.

Va. Code Ann. § 24.2-509.

Oklahoma, 413 U.S. 601, 612 (1973). The overbreadth doctrine permits litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick, 413 U.S. at 612. "Overbreadth attacks have also been allowed where the Court thought rights of association were ensnared in statutes which, by their broad sweep, might result in burdening innocent associations." Id. (listing cases).

"The overbreadth doctrine is strong medicine that is used sparingly and only as a last resort." N.Y. State Club Ass'n, Inc. v. New York, 487 U.S. 1, 14 (1988). Accordingly, the Supreme Court has imposed the requirement that "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Members of City Council of City of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984). Where a plaintiff raises an overbreadth challenge to a statutory provision that is not applicable to him, "[t]he crucial issues are whether [the plaintiff] satisfies the requirement of 'injury-in-fact,' and whether it can be expected satisfactorily to frame the issues in the case." Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 958 (1984).

In this case, the court has little trouble in determining that the second and third sentences of the Act "significantly compromise" the associational rights of General Assembly committees. Taxpayers for Vincent, 466 U.S. at 801. Indeed, the Act limits General Assembly committees' ability to select a nomination method more than it restricts non-General Assembly committees. Unlike non-General Assembly incumbents, General

Assembly incumbents have unilateral power to require their committee to host a party-run nomination method such as a party canvass or mass meeting. The Constitution does not allow an incumbent to have a statutory right to force his party to fund and conduct a particular nomination method. Cf. Tashjian, 479 U.S. at 224. Moreover, the Act burdens General Assembly committees in all the ways it burdens non-General Assembly committees. The court has already determined that the Act impermissibly regulates non-General Assembly committees such as the 6th Congressional Committee. So the constitutionality of the second and third sentences of the Act is more than "satisfactorily [] frame[d]," Munson, 467 U.S. at 958; their invalidity is a foregone conclusion. The Act's provision of benefits to incumbents contravenes political parties' associational rights regardless of the electoral district at issue.

To leave in place the Act's regulation of General Assembly committees would result in an illogical remedy that ignores Booker's requirement to retain only constitutionally valid provisions of a statute. The second and third sentences of the Act are not constitutionally permissible and must be excised from state law. The remaining provisions of the Act—the first, fifth, and six sentences—are merely incidental to Act's provision of benefits to incumbents. Leaving in place such ancillary statutory language would not be consistent with the General Assembly's "basic objectives in enacting the statute." Booker, 543 U.S. at 259. Therefore, the court will grant the 6th Congressional Committee's request to declare the entirety of Virginia Code § 24.2-509(B) unconstitutional and enjoin its enforcement.

Lastly, the court recognizes that "[f]acial challenges [to state statutes] are disfavored." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008). Indeed, "a

facial challenge must fail where the statute has a plainly legitimate sweep." Wash. State Grange, 552 U.S. at 449.[25] Justices Breyer and Ginsburg have urged that judicial deference to state election laws is particularly important, but only where "that deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge." Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 402 (2000) (Breyer, J., concurring). The Act expressly advances that very constitutional evil and has no legitimate sweep. Accordingly, it must be struck down as facially invalid.

## VI.

For the reasons stated above, the court will **GRANT** summary judgment in favor of the 6th Congressional Committee, and **DENY** summary judgment as to all other parties. The court will permanently enjoin the Virginia Department of Elections and members of the Board of Elections from enforcing Virginia Code § 24.2-509(B), effective immediately.

An appropriate Order will be entered.

Entered: 01−19−2018

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge

---

[25] In United States v. Salerno, 481 U.S. 739, 745 (1987), the Supreme Court stated that a plaintiff can only succeed in a facial challenge by showing "that no set of circumstances exists under which the Act would be valid." In Washington State Grange, however, the Supreme Court noted that "[w]hile some Members of the Court have criticized the Salerno formulation, all agree that a facial challenge must fail where the statute has a plainly legitimate sweep." 552 U.S. at 449. In this case, the Act fails both tests, including the higher standard announced in Salerno, and thus, demands facial invalidation.